Hunter Will.

Argued September 30, 1964. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

reargument refused December 10, 1964.

*Joseph I. Lewis* and *Robert W. Smith, Jr.,* with them *Smith, Best & Horn,* for appellants.

*Gilbert J. Helwig,* with him *H. Reginald Belden, Louis E. Sensenich, Mason Walsh, Jr.,* and *Reed, Smith, Shaw & McClay,* for appellees.

OPINION BY MR. JUSTICE ROBERTS, November 10, 1964:

Adelaide C. Hunter died November 13, 1962, at the age of seventy-nine. This appeal arises from an adjudication that testatrix lacked testamentary capacity on November 24, 1960, to revoke her will dated April 17, 1953, and that she was without testamentary capacity on January 16, 1962, to execute a new will.

Appellant is Grace G. Hunter, executrix of the estate of David A. Hunter, deceased,[1] who, together with Christine Hunter Clark,[2] was the primary beneficiary, residuary legatee, and proponent of the will of January 16, 1962. Appellees are contestants of that will and offered for probate a carbon copy of an earlier will dated April 17, 1953.

Following certification of the entire record to the orphans' court by the register of wills, counsel for David Hunter filed a formal request for trial by jury. The matter came on for hearing before the court, sitting without a jury.

The hearing judge concluded there was no necessity for a trial by jury. He made extensive findings of fact and conclusions of law sustaining the caveat to the 1962 will and dismissing the caveat against the probate of the 1953 will. A carbon copy of the 1953 will was admitted to probate. This appeal followed.

It is not disputed that, as determined by the court below, "prior to October of 1960, Adelaide C. Hunter was a woman of brilliant intellect, able and accustomed to taking care of herself and her own affairs, with a wide range of interests in the fields of business, culture and local civic affairs. She had a successful career as a business woman in the advertising and personnel departments of May Department Stores, Kaufmann Division, in Pittsburgh, Pennsylvania, until her retirement in 1953." It is also undisputed that testatrix suffered a cerebral vascular accident and was con-

---

[1] David Hunter survived the testatrix, but has since died. His estate continues his claimed interest under the 1962 will.

[2] Although the appeal purports to be on behalf of Christine H. Clark as well as by the personal representative of David A. Hunter, Christine H. Clark never joined in the proceedings below in any way whatsoever, nor has her intervention been requested or allowed. She is therefore incorrectly and improperly designated as an appellant.

fined in Montefiore Hospital, Pittsburgh, from October 16, 1960, until November 5, 1960.

Based on the testimony of examining physicians[3] and laymen who observed testatrix from the time of

[3] Dr. T. T. Dakin, a general practitioner, directed testatrix's admission to the Montefiore Hospital. He did so because he found her blood pressure mildly elevated and she was in a state of mental confusion which he diagnosed as arteriosclerosis of the brain with an acute thrombosis and hemorrhage. Dr. Dakin again saw testatrix on November 7, 1960, when she returned from the hospital; she still had poor memory for recent events. He saw testatrix on February 17, 1961, when she had another cerebral incident. A third incident occurred on October 10, 1961. Dr. Dakin again saw the patient on November 4, 1961. On January 10 and 27, and July 11, 1962, he attended the testatrix for a glandular condition. The doctor visited her again on November 8, 1962. He stated she was never able to answer any questions and he concluded that she did not have testamentary capacity on any of the above dates.

Testatrix was also under the care of Dr. Richard P. Shapera, a specialist in internal medicine, who first saw her on October 10, 1960, and later when she was admitted to the hospital. He diagnosed her condition as resulting from a cerebral vascular accident affecting the area of the brain associated with thinking, remembering and orientation. In the doctor's opinion, testatrix was "demented" when she was discharged from the hospital. He did not see her at any later time. Dr. Shapera expressed the opinion that she lacked testamentary capacity when she was discharged from the hospital and doubted that her condition would have changed within twenty days (the period within which testatrix allegedly revoked her 1953 will).

Dr. Shapera consulted with Dr. Lowell Lubic, a neurologist, who examined testatrix and rendered a neurological evaluation and determination of her mental status while in the hospital. Dr. Lubic found the patient suffering from cerebral vascular insufficiency with organic syndrome. The frontal lobe of the brain (responsible for indirect reasoning and judgment), he concluded, was affected and the condition was not reversible. It was his opinion that she could not have had testamentary capacity at any time after the episode.

David Hunter called as a witness Dr. L. D. Altman, also a neurologist, who expressed the opinion that testatrix could have

her stroke until her death, together with documentary evidence, the court concluded that the stroke she suffered affected the frontal lobe of her brain and permanently impaired her judgment, reasoning and thinking processes. In light of this determination, the court carefully scrutinized the behavior and activities of testatrix bearing on the issues raised by this proceeding.

When testatrix returned to her home from the hospital, she was placed under the care of a housekeeper and practical nurse who remained with her until her death. David Hunter then undertook to attend to all of her affairs pursuant to a general power of attorney which he prepared for her and which she signed.[4]

On November 24, 1960, only nineteen days after testatrix's discharge from the hospital, David Hunter drove his aunt to his home in Pittsburgh. During the drive, they discussed the revocation of her 1953 will. Some time after they arrived at Mr. Hunter's home, he

---

had remissions to normalcy at the times in issue. He had never treated or examined testatrix, nor had he consulted with any of her physicians or discussed her condition with anyone who observed her after the stroke. Moreover, the court below noted that appellant's position was not that testatrix had lucid intervals or periods of remission when she revoked the first will and executed the second, but that she was competent at all times. Accordingly, the court concluded that Dr. Altman's testimony was of little value.

[4] It was not disputed, and the court below found, that: "David A. Hunter had a general power of attorney for Adelaide C. Hunter. He deposited her checks, withdrew money from her bank accounts, furnished the decedent's nurse with funds to run the decedent's household, prepared her will, assisted in sale of stock, deposited Social Security and pension checks, paid her hospitalization policy premiums, received money from a Chapman estate distribution, paid small bills of the decedent and prepared her income tax return for 1960 without consulting her. For these services he received $75 per month. David A. Hunter stood in a confidential relationship to Adelaide C. Hunter. In addition to the above, he arranged to have her sign a card appointing him as her deputy to enter her safe deposit box."

called Howard R. Eulenstein, an attorney, to witness the destruction of that will.[5]

Mr. Eulenstein testified that testatrix spent twenty-five to thirty minutes looking at the will, during the course of which she asked questions as to what various items meant. She then destroyed the will by tearing it in the presence of Eulenstein and Hunter. Eulenstein did not know that testatrix had suffered a stroke, and Hunter did not inform him of the stroke. Eulenstein was not aware of the contents of the will or of the changes testatrix wanted made. Eulenstein's unawareness that decedent had suffered a stroke obviously influenced the court's evaluation of the witness's opinion concerning testatrix's testamentary capacity on that day.

"While the decedent was at the home of David A. Hunter a Reverend Hugh S. Clark talked to her on the telephone and the decedent said, 'I haven't the faintest idea where I am.' When she was returned to her own home she did not know where she had been or that she had been away from her own home."[6] Her housekeeper testified that testatrix, after her stroke, was always confused when she was away from her own home.[7]

Decedent's will of January 16, 1962, was executed more than a year after the discussion of changes in her 1953 will and its destruction.

---

[5] About a week later, David Hunter procured from Mr. Eulenstein an affidavit as to the destruction of the will.

[6] From the findings of fact in the opinion below.

[7] The court below observed: "The fact that the decedent had to read the will of 1953 for twenty-five to thirty minutes and ask what various items meant indicates she did not understand it. That will is very simple, contains no trust or complicated provisions and can be read and understood by an intelligent person in a very few minutes. She did not indicate what she wanted changed and did not execute a new will for some thirteen months thereafter."

On January 16, David Hunter called at the home of testatrix and asked to talk with her alone. Hunter had brought with him a will which he had prepared. Testatrix was taken by Hunter to the home of a friend of the testatrix where she executed the will in the presence of her friend and two attorneys (both of whom occupied the same office suite as David Hunter). Hunter was not present during an alleged discussion of the document or when it was executed. One of the attorneys indicated he was not previously aware of the specific nature of testatrix's illness nor was he, at that time, informed of the illness. He did testify that testatrix appeared somewhat more hesitant in her recollection than she was on previous occasions.

At some place in this chain of events, the will was apparently read to testatrix by the other attorney. She did not read it herself, but noted her acceptance of specific provisions by indicating verbally what she wanted and by nodding her head.[8] The explanation of the will took about a half hour, during which testatrix asked no questions. Apparently, after the will was read to her, she looked at it for a few minutes. She then indicated she wanted the friend to witness the execution of the will.

The neighbor was satisfied that testatrix knew she was signing a "paper" and that she wanted to sign it, but at the time no particular mention was made of the fact that it was a will. More significant, however, is the testimony of the neighbor that had she at that time known the test for testamentary capacity, she would not have witnessed the execution of the document. The court also found that upon testatrix's re-

---

[8] The attorney who read the will (who was aware that testatrix had had a stroke) testified he initially handed the document to testatrix, but she merely returned it to him and he then read it to her.

turn to her home, she did not know where she had been.

In addition to the medical testimony and the testimony relating to the specific dates in issue, the court made numerous findings based on lay testimony pertinent to the issue of testamentary capacity.[9] David Hunter also offered testimony of lay witnesses dealing with decedent's condition after her stroke, but the court did not accept their testimony as credible. "It is difficult to believe those who testified that the decedent was essentially the same mentally after her stroke as she was before her stroke."[10]

The law requires the same testamentary capacity to revoke a will as to execute a will. *Kapp's Estate,* 317 Pa. 253, 176 Atl. 501 (1935). The test for such capacity is well known. A testatrix possesses testamentary capacity if she has an intelligent knowledge re-

---

[9] "After her stroke in October, 1960, Adelaide C. Hunter lost interest in most of her prior activities, no longer read or took an interest in the stock market or other business matters in which she had previously been interested. There was no change in this condition from the date of her stroke until her death in November, 1962.

"After her stroke the decedent thought her mother, her sister, Edgar Kaufmann, Mrs. Kaufmann and a Mr. Wolfe were still living, although all had died. She did not know her neighbors with whom she had previously been friendly. She did not know her way about in Murrysville where she had lived for a long time. She did not know who lived along the short road into her house and did not know the way to her own home. In the Fall of 1960, after October, she could not answer any questions such as what she had for breakfast or what happened the day before. She was attended constantly after her stroke by a practical nurse, a Mrs. Adelaide Lennox, on the advice of her physician. She became lost in her own house. She believed she was still working at Kaufmann's, although she had retired in 1953. She did not recognize her own church until the minister spoke. She repeatedly asked the same question several times when talking to neighbors." From the findings of fact in the opinion of the court below.

[10] From the opinion of the court below.

garding the natural objects of her bounty, of what her estate consists, and of what she desires done with her estate, even though her memory may have been impaired by age or disease. *Sommerville Will,* 406 Pa. 207, 217, 177 A. 2d 496, 501 (1962).

Upon consideration of the entire record, the court found that the required testamentary capacity was not present on each of the dates in issue. It therefore refused to direct that the writing of January 16, 1962, be admitted to probate.

It is true, generally, that mental competency is presumed and that the burden of establishing incompetency rests upon those who challenge competency (here the appellees). *Girsh Trust,* 410 Pa. 455, 468, 189 A. 2d 852, 858 (1963). However, the appellees clearly met that burden here and the burden of proof shifted to the appellant. See id. at 468-70, 189 A. 2d at 858-59. The record shows that appellant failed to prove by clear and convincing evidence that testatrix possessed the ability to understand and appreciate the nature and effect of her actions on November 24, 1960, and January 16, 1962.

The appellant does not contend that testatrix's crucial actions took place during lucid intervals, but rather that testatrix had testamentary capacity at all times from November 24, 1960, to January 16, 1962. The thrust of appellant's argument appears to be that the court is bound to accord, as a matter of law, greater significance to the testimony of the witnesses who actually saw the physical destruction or revocation of the 1953 will than to the testimony of other witnesses who establish a circumstantial case. And appellant contends similar significance must likewise be given to the testimony of witnesses who observed the execution of the 1962 will.

This argument assumes the complete and almost exclusive credibility of the witnesses who saw the events

in issue. In effect, it disregards other competent evidence, irrespective of its persuasiveness. It is axiomatic that the credibility of witnesses, professional or lay, and the weight to be given their testimony, is strictly within the proper province of the trier of fact.

The court's unwillingness to give controlling weight to the testimony of persons who witnessed the events of November 24, 1960, and January 16, 1962, was not entirely a matter of disbelieving them. The court was undoubtedly influenced also by the realization that some of these witnesses were not in a position to evaluate properly testatrix's testamentary capacity because they were either not adequately aware of her mental condition or were totally ignorant of it. The hearing judge was satisfied by clear and convincing evidence that testatrix did not possess testamentary capacity on either crucial occasion.

We find nothing in this record which requires us to disturb the conclusions of the judge who heard and saw the witnesses. Our review of the record satisfies us that the findings of the hearing judge are fully supported by competent and adequate evidence. The record is free from legal error, abuse of discretion, or capricious disbelief of competent or credible evidence. Accordingly, there is no basis for altering the determinations below. *Dettra Will,* 415 Pa. 197, 202 A. 2d 827 (1964); *Lanning Will,* 414 Pa. 313, 200 A. 2d 392 (1964); *Girsh Trust,* supra.

Further, appellant challenges the court's conclusion that there was no necessity for a trial by jury. Appellant's argument assumes the right to a trial by jury, an assumption which is erroneous. This case came before the court subsequent to the effective date of the Act of July 14, 1961, P. L. 610, §1, 20 P.S. §2080.745, and is governed by its mandate. Prior to that Act, we held that the existence of a substantial dispute of fact in a will contest entitled the parties to a trial by jury

under the then applicable statute. *Murray Will*, 404 Pa. 120, 128, 171 A. 2d 171, 175 (1961). But the Act of 1961 now limits the right to trial by jury to those instances where substantial disputes of fact exist as to the decedent's title to property,[11] or where proceedings to establish incompetency have been instituted.[12]

Will contests and other matters are now governed by subsection (c) of the above statute which reads: "(c) Will Contest and Other Matters. When a contest shall arise concerning the validity of a writing alleged to be testamentary or concerning any matter other than as provided in subsections (a) and (b) of this section, the court, in its discretion at any stage of the proceedings, may impanel a jury to decide any question of fact but the verdict of the jury shall be advisory only."

Under the 1961 statute we need not determine whether any substantial question of fact existed in the case at bar. The only question we need ask is: Did the trial court abuse its discretion in refusing to submit the issues to a jury for an advisory opinion? A court's unwillingness to avail itself of the assistance of an advisory jury opinion does not constitute an abuse of discretion. To hold otherwise would be an unwarranted interference with the exercise of the discretion vested solely in the trial court by the statute.

Appellant seeks to infer a right to trial by jury from the provisions of subsection (d) of the statute which reads: "(d) Waiver of Right. A person desiring a trial by jury shall make demand therefor, in writing, at least ten days prior to the initial hearing before the court, or, if the initial hearing is dispensed with as provided in section 746(a.1), then at least ten days prior to the trial. The right to trial by jury is

---

[11] Section 745(a), 20 P.S. §2080.745(a).
[12] Section 745(b), 20 P.S. §2080.745(b).

waived if such demand is not so made or, after having been made, the person claiming the right fails to appear."

This section does not create the right to trial by jury in and of itself. The provision simply sets forth the manner in which a trial by jury, where the right to a jury trial exists under the statute, may be requested or waived. It is clear from the language of the statute that the right to a jury trial does not exist here. See *Dettra Will,* supra, at 204, 202 A. 2d at 831.

The decree of the court below is affirmed. Appellant's costs to be paid by the estate of David A. Hunter. Appellees to pay own costs.

