379 A.2d 535

**In re Involuntary Termination of Parental Rights of Shannon Coleen BURNS and Kelly Taylor.**

**Appeal of Sandra BURNS, mother of said infant children.**

Supreme Court of Pennsylvania.

Argued March 8, 1977.

Decided Oct. 28, 1977.

616

Thomas H. Newbraugh, Southwestern Pa. Legal Aid Society, Waynesburg, T. P. Hennessy, Uniontown, for appellant.

R. Wallace Maxwell, Waynesburg, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POM-
EROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

Sandra Burns appeals from the January 30, 1976 decree of
the Orphans' Court Division of the Court of Common Pleas
of Greene County terminating her parental rights with
regard to her minor children Shannon Coleen Burns and
Kelly Taylor.[1] Acting upon a petition filed by Child Welfare
Services of Greene County, the orphans' court found that
appellant had abandoned the two children and had failed to
perform parental duties for a sufficient period to justify
involuntary termination of her parental rights.[2]

Appellant raises two issues. First, she contends that the
evidence is insufficient to support a finding of abandonment.
Second, she challenges the termination of her parental rights
to Kelly Taylor as improper in light of the orphans' court's
determination that the natural father preserved his parental
rights. We find appellant's claims without merit, and af-
firm.

## I

The record establishes that the home situation of appel-
lant and her family seriously deteriorated in late 1973.
Appellant and her husband, Gary Burns, were living in a
trailer with their child, Shannon Coleen Burns, then one and
one half years old, and appellant's two older children by
previous marriages, Kelly Taylor, then seven, and John

1. We hear this appeal pursuant to the Appellate Court Jurisdiction
 Act, Act of July 31, 1970, P.L. 673, § 202(3), 17 P.S. § 211.202(3)
 (Supp.1976).

2. See Act of July 24, 1970, P.L. 620, § 311, 1 P.S. § 311 (Supp.1976).

McDowell, then fourteen.[3] Neighbors from the trailer court, including the owner of appellant's trailer and his wife, testified that appellant and her husband were both out of work, drank heavily, and regularly left the children unattended for hours at a time.

Child Welfare Services became involved after receiving a report in December, 1973, from a resident of the trailer park who was concerned about the lack of care being received by appellant's children.[4] An agency worker visited the trailer twice on January 7, 1974. Neither appellant nor her husband were present at either time. The three children were left alone without an adult in charge. The worker observed that clothes were strewn throughout the living room, that Kelly's eye was pink, and that the baby, Shannon Coleen, was dirty and improperly clothed. John said that his mother and stepfather were out trying to find a doctor, but that he did not know who the doctor was. When asked if he and the other children had anything to eat, John replied that appellant and her husband would bring groceries back when they returned. The worker made a third visit to the trailer later in January and again found the children unattended.

Shortly thereafter, appellant and her husband were given notice to vacate the trailer because its condition was rapidly deteriorating from their lack of care. When the Burnses showed no intention of leaving, their landlord, upon his attorney's advice, locked them out. Appellant, her husband, and the two older children moved to an apartment in

3. No petition was brought with respect to appellant's oldest child, John McDowell, and he is not involved in this appeal.

4. Greene County Child Welfare Services had previous contacts with appellant and her two older children. In January, 1970, the agency contacted appellant, who was living in Alabama with John and Kelly, and a man named Calvin Smith. The agency contacted appellant because of a court order directing the father of Kelly to make child support payments. Appellant returned to Greene County and in November, 1970, requested that the agency find temporary foster home placement for Kelly and John while she underwent treatment for alcoholism. The two children were placed in foster homes until March, 1971, when they were returned to appellant, who was then living with a Mr. Scott in Pittsburgh.

Waynesburg. Appellant asked a friend, Mrs. William Corwin, to take care of Shannon.[5]

After the eviction, Mr. Burns contacted the Child Welfare Services worker, who had written to the Burnses after her unsuccessful efforts to visit them at the trailer. The worker contacted the trailer owner on behalf of the Burnses, and obtained their clothing from the trailer. On January 23, she met with appellant at the apartment to discuss the family's situation. Appellant was in considerable discomfort, however, and the meeting was short. The same day, appellant entered the hospital and subsequently suffered a miscarriage.

After entering the hospital appellant asked a nurse's aide, Mrs. Flora Davis, if she would take care of Kelly while appellant was in the hospital. Mrs. Davis agreed to do so. Mr. Burns was to bring Kelly to an agreed upon location in town where Mrs. Davis was to receive the child. He did not appear, however, and the following day both Kelly and John arrived at Mrs. Davis' house in a taxi. Although appellant had never asked her to take care of John, Mrs. Davis took both children and kept them for at least four days. Appellant did not notify Mrs. Davis when she was discharged from the hospital. When Mrs. Davis learned from the hospital that appellant had been discharged, she took the children and began looking for appellant. Mrs. Davis located the mother at a bar or restaurant and returned Kelly and John. Appellant appeared to have been drinking and gave an incoherent explanation for not contacting Mrs. Davis after her discharge from the hospital.

Shortly after appellant left the hospital, she and her husband went to Uniontown, Pennsylvania, to look for a new place to live. John was left with a relative. Kelly was left with Mrs. Corwin, who had been taking care of Shannon since appellant entered the hospital. In late January, however, Mrs. Corwin suffered a broken leg and her neighbor, Mrs. Kress, took over the care of the two children.

5. Mrs. Corwin had previously cared for Shannon for appellant from September, 1972 until May, 1973. The circumstances surrounding this nine month relinquishment were not brought out at the hearing.

On February 7, 1974, John went to the Child Welfare Services office with his aunt and told the worker he wanted to be "truthful" about the family situation. Based on the agency's prior knowledge of the family, and the information provided by John, Child Welfare Services immediately obtained a court order authorizing the placement of Kelly and Shannon in foster care. The two children were taken from the Kress home and placed in foster care the same day.

A hearing on foster care placement was scheduled for February 14, and notice was sent to appellant and her husband by registered mail to their last known address. Appellant and her husband did not receive this notice until after the hearing. However, appellant learned of the hearing through her mother-in-law a day or two before it was held. Appellant testified that she was unable to attend the hearing because she had no transportation from Uniontown. On the day of the hearing appellant reached the Child Welfare Services worker in the judge's chambers by telephone. She was extremely angered by the agency's placement of the children in foster care and told the worker, "There's going to be somebody dead over this." The worker made an appointment for appellant and Mr. Burns to visit with her the following day. The appointment was not kept.

Thereafter, neither appellant nor her husband contacted Child Welfare Services again. Neither parent communicated with Kelly or Shannon or the foster parents. When the children had been in foster care for more than ten months, with no parental contact, Child Welfare Services petitioned to terminate the parental rights of appellant, her husband, and Paul Taylor, Kelly's father. Appellant learned of the petition from her mother-in-law [6] and, for the first time, sought legal advice.

Appellant acknowledged at the termination hearing that she never contacted Child Welfare Services, or her children, after they were placed in foster care. She testified that she did not contact the agency because she lost all respect for it

[6]. Because appellant and her husband never advised Child Welfare Services of their address, notice was by publication.

when the agency placed the children in foster care without her consent. She explained that she did not communicate with the children because she desired to spare them the anguish of seeing her while in the custody of others.

During the ten month period before the termination hearing, appellant remained in touch with Mrs. Corwin, who visited the children several times in their foster homes and advised appellant that Kelly and Shannon were receiving adequate care. At appellant's request, Mrs. Corwin purchased presents for the children on holidays and their birthdays. Appellant's mother called Child Welfare Services on occasion to inquire about the children, and would convey information regarding them to appellant.

In July, 1974, appellant, who had again moved, this time to Ohio, stopped drinking and began attending Alcoholics Anonymous (AA) meetings, a practice she has continued. Fellow members of AA testified to her apparent rehabilitation and stated that she often mentioned her desire to regain custody of her children.

## II

Appellant argues that these facts are insufficient to establish grounds for the involuntary termination of her parental rights. We do not agree.

Section 311(1) of the Adoption Act provides that parental rights may be terminated, after hearing, when:

"The parent by conduct continuing for a period of at least six months either has evidenced a settled purpose of relinquishing parental claim to a child, or has refused or failed to perform parental duties."

1 P.S. § 311(1) (Supp.1976). Unlike its predecessor,[7] section 311(1) establishes alternative grounds for proving abandon-

7. Prior to the Adoption Act of 1970 it was necessary to show both a settled purpose to relinquish parental claims and a refusal or failure to perform parental duties for a minimum six month period. Act of April 4, 1925, P.L. 127, § 1, as amended, formerly codified at 1 P.S. § 1 (1963). See, e. g., *In re Smith's Adoption*, 412 Pa. 501, 194 A.2d 919 (1963); *Harvey Adoption Case*, 375 Pa. 1, 99 A.2d 276 (1953).

ment. Under present law, parental rights may be forfeited for failure to perform parental duties for a six month period, despite the absence of a settled purpose to relinquish parental claims. *Adoption of Croissette*, 468 Pa. 417, 364 A.2d 263 (1976); *In re Adoption of M.T.T.*, 467 Pa. 88, 354 A.2d 564 (1976); *In re Adoption of Mahlon Nichelle McCray*, 460 Pa. 210, 331 A.2d 652 (1975). Thus, we need not decide whether appellant's efforts to remain informed as to the condition of her children negates a finding of a "settled purpose" to relinquish her parental claim.

Our inquiry is whether the orphans' court's determination that appellant refused or failed to perform parental duties for at least six months is supported by competent evidence. *Adoption of M.T.T.*, supra; *Adoption of Farabelli*, 460 Pa. 423, 333 A.2d 846 (1975); *Sheaffer Appeal*, 452 Pa. 165, 305 A.2d 36 (1973). The adjudication of the orphans' court will not be disturbed if "the record is free from legal error and . . . if the chancellor's findings are supported by competent and adequate evidence, and are not predicated upon capricious disbelief of competent and credible evidence." *Cohen Will*, 445 Pa. 549, 550, 284 A.2d 754, 755 (1971); *Holtz Will*, 422 Pa. 540, 544, 222 A.2d 885, 888 (1966); *Hunter Will*, 416 Pa. 127, 136, 205 A.2d 97, 103 (1964).

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance. *In re Adoption of Orwick*, 464 Pa. 549, 347 A.2d 677 (1976); *In re Adoption of Mahlon Nichelle McCray*, supra; *Appeal of Diane B.*, 456 Pa. 429, 321 A.2d 618 (1974); *In re Smith's Adoption*, 412 Pa. 501, 194 A.2d 919 (1963). This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association

with the child. *In re Adoption of Mahlon Nichelle McCray,* supra; *Appeal of Diane B.,* supra; *In re Adoption of Jagodzinski,* 444 Pa. 511, 281 A.2d 868 (1971). Because a child needs more than a benefactor, parental duty requires that a parent "exert himself to take and maintain a place of importance in the child's life." *Appeal of Diane B.,* supra, 456 Pa. at 433, 321 A.2d at 620, quoting *In Re: Adoption of J.R.F.,* 27 Somerset L.J. 298, 304–05 (Pa.C.P.1972).

With these principles in mind, the question whether a parent has failed or refused to perform parental duties must be analyzed in relation to the particular circumstances of the case. A finding of abandonment, which has been characterized as "one of the most severe steps the court can take," *Sarver Adoption Case,* 444 Pa. 507, 509, 281 A.2d 890, 891 (1971), will not be predicated upon parental conduct which is reasonably explained or which resulted from circumstances beyond the parent's control. It may only result when a parent has failed to utilize all available resources to preserve the parental relationship. *Adoption of Croissette,* supra; *Adoption of M.T.T.,* supra; *In re Adoption of Mahlon Nichelle McCray,* supra.

The record supports the orphans' court's determination that appellant failed to perform parental duties for more than six months. From the date her children were placed in foster care, until she responded to the petition to terminate her parental rights more than ten months later, appellant completely removed herself from active involvement in the lives of her children. Despite appellant's hostile reaction to having her children placed in foster care, after the placement she was content to allow others to provide for their care and support, while she pursued goals and activities of her own. Appellant's passive interest in their well being did not satisfy the children's continuing needs for responsible parental care. Her conduct did not satisfy her affirmative duty to utilize all available resources to preserve her parental rights.

Appellant's explanation of her conduct does not compel a different conclusion. She argues that Child Welfare Services was not justified in placing the children in foster care because there is no evidence that the care they were receiving at Mrs. Kress' home was inadequate. Because she believed the placement unwarranted, she refused to contact the agency. The record amply supports a finding that judicial action was necessary at the time the children were placed in the custody of the agency. The haphazard manner in which Kelly and Shannon Coleen, in appellant's absence, found their way into an unfamiliar home, supports this conclusion. However, even if the court had erred in placing the children in foster care, this occurrence would not suspend appellant's duty to continue efforts to maintain a place of importance in her children's lives. The children, and not the agency, suffered from appellant's inaction.

Appellant also explains that she was ill much of the time the children were in foster care, and had many things to do. We do not believe, however, that appellant's health, financial and emotional problems justified her failure to make any effort to perform her parental duties. We have held that parental rights may not be preserved by "waiting for some more suitable financial circumstance or convenient time for the performance of parental duties and responsibilities (while others adequately provide the child with [his or] her immediate and continuing physical and emotional needs)." *In re Smith's Adoption*, 412 Pa. at 505, 194 A.2d at 922. Parental duty does not require the impossible, but may encompass that which is difficult and demanding. A parent may not yield to every problem, but must act affirmatively, with good faith interest and effort, to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. See *In re Adoption of Orwick*, supra; *In re Adoption of Mahlon Nichelle McCray*, supra; *In Re: Adoption of J.R.F.*, supra. Appellant has not demonstrated performance of the parental duties required by statutory and case law.

### III

Appellant's second contention relates only to the termination of her parental rights to her older daughter, Kelly Taylor. She points out that the purpose of terminating parental rights is to free the child for adoption. Because the orphans' court refused to terminate the parental rights of Kelly's father, Paul Taylor,[8] appellant asserts that Kelly's adoption cannot be contemplated. She contends that in these circumstances the termination of her rights is punitive and improper under the Adoption Act.

We cannot agree with appellant's assertion that the decree terminating her parental rights must be set aside because the orphans' court did not also terminate the parental rights of Kelly's father. Nothing in the Adoption Act requires that an agency, which has assumed custody of a child, must establish grounds for the involuntary termination of both parents, before it can obtain such a decree as to either. When an agency having custody of a child petitions for termination of parental rights, the rights of the respective natural parents must be determined independently.

We have recently held that "the purpose of involuntary termination of parental rights is to dispense with the need for parental consent to an adoption when, by choice or neglect, a parent has failed to meet the continuing needs of the child." *In re Male Infant B. E.,* 474 Pa. 139 at 145, 377 A.2d 153, at 156 (1977). Consequently, a petition to terminate parental rights under the Adoption Act may only be brought when adoption is contemplated. Id. 474 Pa. at 144, 377 A.2d at 155.

However, as we stated in *Male Infant B. E.,* "An agency bringing a petition for termination of parental rights has as its continuing concern the eventual placement of the child for adoption when it finds a suitable parent or parents." (474 Pa. at 143, n. 5, 377 A.2d at 155, n. 5). Therefore, when a child is in the custody of an approved adoption agency, it is not necessary that adoption be imminent before the agency may petition to have a parent's rights terminat-

8. See footnote 2, infra.

ed. Nor must a particular adoption plan be established before the agency's petition may be sustained. One of the purposes of the Adoption Act of 1970 was to permit an agency to seek termination of parental rights independently of an adoption. *In re Male Infant B. E.,* supra (474 Pa. at 143, n. 5, 377 A.2d at 155, n. 5). This legislative plan facilities adoption because it allows agencies to proceed with termination petitions when grounds exist, without the necessity of involving prospective adoptive parents in termination proceedings.

The right of either parent to withhold consent to adoption represents a significant restraint on an agency's ability to find a suitable home for the child. It cannot be presumed, as appellant argues, that because one parent has preserved his or her parental rights, adoption of a child in the custody of an agency cannot be contemplated. A parent may, in order to avoid the stigma of a finding of abandonment, oppose a petition to terminate parental rights, and yet be willing to consent to an adoption he or she perceives to be in the best interests of the child. It is also possible that, despite a present finding that a parent's rights have been preserved, subsequent failure to maintain the parental relationship may at a later time justify termination of the parent's rights. An adjudication that a parent has not forfeited his or her parental rights does not preclude a contrary determination, based on other facts, in the future.

We note that Mr. Taylor has assumed custody of Kelly for only a brief period in her life, despite the fact that his daughter has been in the care of non-parents for significant periods of time. We are unwilling to assume that if he continues to be unwilling or unable to provide a home for her, the possibility of adoption, with his consent or otherwise, cannot be contemplated.

At the time Child Welfare Services petitioned to terminate appellant's parental rights, eventual adoption of Kelly was contemplated, and that possibility remains. Because appellant has forfeited her parental rights, her consent to adoption will be unnecessary.

The finding that appellant failed to perform parental duties for a period in excess of six months is supported by adequate evidence, and the termination of her parental rights was proper.

Decree affirmed. Each party pay own costs.

NIX, J., filed a concurring and dissenting opinion.

MANDERINO, J., filed a dissenting opinion.

NIX, Justice, concurring and dissenting.

In this appeal Sandra Burns, natural mother of Shannon Coleen Burns and Kelly Taylor, appealed from the decree of the Orphans' Court Division of the Court of Common Pleas of Greene County involuntarily terminating her parental rights. I agree, under the facts of this case, with the majority's conclusion that the record establishes that "for a period of at least six months [Ms. Burns] refused or failed to perform parental duties"[1] and therefore the court was correct in entering the order as to the minor Shannon Coleen Burns.

I cannot, however, agree with that conclusion with reference to the older daughter, Kelly Taylor. As the majority opinion indicates, the court below refused to terminate the rights of Kelly's natural father, Paul Taylor. Under these circumstances, it is obvious that at the present time an adoption of Kelly is not being contemplated. In our recent decision in *In re: Male Infant B. E.*, 474 Pa. 139, 377 A.2d 153 (1977), we held that the Adoption Act provides for termination of parental rights only in connection with a plan for adoption. In my judgment the ruling in that case precludes the involuntary termination of Ms. Burns' parental rights as to Kelly at this time.

MANDERINO, Justice, dissenting.

I dissent. Implicit in the majority's reasoning is the conclusion that alcoholism is a moral fault or legal fault rather than a disease. I cannot accept this premise. During

1. *See* Act of July 24, 1970, P.L. 620, § 311, 1 P.S. § 311 (Supp.1976).

630

the ten-month period when appellant did not have her children she was suffering from a disease and, indeed, sought help and was cured. Under these circumstances there was no basis to find that appellant had abandoned her children.

The majority holds that the appellant's "health, financial and emotional problems" are not justification for failure to perform parental duties. I cannot agree. Suppose the appellant had cancer, or had suffered an accident requiring prolonged hospitalization. Under the majority's reasoning, that parent's parental rights could be terminated for failure to perform parental duties. I am compelled to dissent.