J-A26027-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF S.-A.T. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.T., JR., FATHER | : | No. 1191 EDA 2021 |

Appeal from the Decree Entered April 14, 2021
In the Court of Common Pleas of Montgomery County
Orphans' Court at No:  2021-A0002

| | | |
|---|---|---|
| IN RE: ADOPTION OF T.T., III | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.T., JR., FATHER | : | No. 1192 EDA 2021 |

Appeal from the Decree Entered April 14, 2021
In the Court of Common Pleas of Montgomery County
Orphans' Court at No:  2021-A0003

| | | |
|---|---|---|
| IN RE: ADOPTION OF S.A.T. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.T., JR., FATHER | : | No. 1193 EDA 2021 |

Appeal from the Decree Entered April 14, 2021
In the Court of Common Pleas of Montgomery County
Orphans' Court at No:  2021-A0005

J-A26027-21

BEFORE: BOWES, J., STABILE, J., and McCAFFERY, J.

MEMORANDUM BY STABILE, J.: **FILED JANUARY 18, 2022**

T.T., Jr. ("Father"), appeals from the decrees entered on April 14, 2021, which terminated involuntarily his parental rights to his children, T.T., III, a male born in November 2012, S.A.T., a female born in June 2014, and S.-A.T., a female born in May 2015 (collectively, "the Children").[1] After careful review, we vacate and remand for further proceedings consistent with this memorandum.

The Montgomery County Office of Children and Youth ("OCY") became involved with the Children beginning in May 2015. N.T., 4/8/21, at 15. Mother tested positive for benzodiazepines and opiates at the time of S.-A.T.'s birth and admitted to taking Xanax and Percocet the day before delivery. *Id.* OCY implemented a safety plan, and Mother and Father were cooperative. *Id.* at 10-11. OCY had no further involvement with the Children until 2019.[2] In April 2019, OCY received a referral indicating Mother had been driving while under the influence of alcohol and prescription medication with the Children in her

---

[1] In addition, the orphans' court terminated involuntarily the parental rights of the Children's mother, S.M. ("Mother"). A prior panel of this Court affirmed the termination of Mother's parental rights on November 16, 2021. *See In Re Adoption of S.A.T.*, 2021 Pa. Super. Unpub. LEXIS 3029 (Pa. Super. filed Nov. 16, 2021) (unpublished memorandum).

[2] OCY did have some involvement with the Children's two older siblings, who are not relevant to this appeal, due to truancy issues in 2018. N.T., 4/8/21, at 11.

vehicle. *Id.* at 12. OCY conducted an investigative home visit in May 2019 and implemented a safety plan pursuant to which Father was not permitted to leave Mother unsupervised with the Children or allow her to drive the Children anywhere. *Id.*

The safety plan proved unsuccessful. Father was hospitalized "shortly after the implementation" of the plan, and OCY received another referral in May 2019 indicating Mother had been driving under the influence with the Children in her vehicle. *Id.* at 13; Order of Adjudication (T.T., III), 6/18/19, at 2. OCY also had concerns regarding alleged conditions in the family's home, which included a lack of food and running water. N.T., 4/8/21, at 13. The Children began living with their maternal grandmother, who became the point person under OCY's safety plan. *Id.* at 14. This lasted only briefly, until the OCY caseworker called the maternal grandmother and learned that she was allowing Mother to drive her and the Children. *Id.*

Due to the ongoing safety concerns, OCY sought protective custody of the Children.[3] *Id.* at 15-16. The juvenile court entered orders for emergency protective custody dated June 4, 2019, followed by shelter care orders dated

---

[3] The record contains evidence of other incidents in 2019 as well, including an incident in January when Mother was arrested for alleged public drunkenness, an incident in March when Mother was arrested for allegedly driving under the influence with the Children in her vehicle, and an incident of alleged domestic violence by Father against Mother in May, after which Mother was arrested on an outstanding warrant. N.T., 4/7/21, at 14, 18, 24-30, 36-42. The OCY caseworker did not cite these incidents as critical to the Children's removal in her testimony.

June 5, 2019. The court issued orders of adjudication dated June 18, 2019, and dispositional orders dated July 2, 2019. The Children have remained in the same foster home continuously since their placement, except for one week in June 2019. N.T., 4/7/21, at 106. At the time of the placement, the record reveals that the Children exhibited developmental delays and deficits in their medical and dental care. *See id.* at 106-29; N.T., 4/8/21, at 26-28, 47-48. Most significantly, S.A.T. and S.-A.T. suffer from sickle cell anemia, and they were ill at the time of their placement, resulting in S.A.T.'s admission to the hospital for three days. N.T., 4/7/21, at 116, 127-29.

On January 15, 2021, OCY filed petitions to terminate Father's parental rights to T.T., III, and S.-A.T. involuntarily. OCY filed a petition to terminate Father's parental rights to S.A.T. on January 19, 2021. The orphans' court conducted a hearing on the petitions on April 7, 2021, and April 8, 2021,[4] at the conclusion of which it announced that it would terminate Father's parental rights. The court entered decrees memorializing its decision on April 14, 2021. Father timely filed separate notices of appeal, along with concise statements of errors complained of on appeal, on April 26, 2021.

Father now raises the following claims for our review:

---

[4] The orphans' court appointed legal counsel and a separate guardian *ad litem* to represent the Children's interests. Both attorneys argued in support of the termination of Father's parental rights and reported the Children expressed a desire to remain with their foster parents. N.T., 4/8/21, at 166-76.

1. The [orphans c]ourt erred in finding clear and convincing evidence to terminate [] Father's parental rights under 23 Pa. C.S.[A.] §2511(a)[(]1[)].

2. The [orphans c]ourt erred in finding clear and convincing evidence to terminate [] Father's parental rights under 23 Pa. C.S.[A.] §2511(a)[(]2[)].

3. The [orphans c]ourt erred in finding clear and convincing evidence to terminate [] Father's parental rights under 23 Pa. C.S.[A.] §2511(a)[(]8[)].

4. Did the [orphans'] court err in permitting hearsay evidence to be admitted and was that evidence more prejudicial than probative[?]

Father's Brief at 8.

We begin by addressing Father's fourth claim. Father contends that the orphans' court improperly admitted hearsay statements by the Children during the testimony of their foster mother, B.M. ("Foster Mother"). As our Supreme Court has explained, "the decision of whether to admit or exclude evidence is within the sound discretion of the orphans' court. A reviewing court will not disturb these rulings absent an abuse of discretion. Discretion is abused if, inter alia, the orphans' court overrides or misapplies the law." *In re A.J.R.-H.*, 188 A.3d 1157, 1166-67 (Pa. 2018) (citations omitted).

Our Rules of Evidence define "hearsay" as "a statement that . . . (1) the declarant does not make while testifying at the current trial or hearing; and . . . (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801(c). Hearsay is generally inadmissible. Pa.R.E. 802. Relevant to this appeal is the exception to the hearsay rule found at Rule 803(3), which provides as follows:

The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:

\*\*\*

**(3) Then-Existing Mental, Emotional, or Physical Condition.** A statement of the declarant's then-existing state of mind (such as motive, intent or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

Pa.R.E. 803(3).

Our Supreme Court addressed the correct application of Rule 803(3) in

***Commonwealth v. Fitzpatrick***, 255 A.3d 452 (Pa. 2021).[5] There, the Court

explained that testimony regarding a person's state of mind may be admissible

under two circumstances. First, the testimony may be admissible if it is not

offered for its truth, in which case it is not hearsay, and Rule 803(3) does not

apply. ***Id.*** at 471-72. An example of this would be testimony that a person

said, "'I can fly to the moon[,]'" which might be offered not to show the person

can actually fly to the moon, but that he or she is suffering from mental illness.

***Id.***

---

[5] We observe the Court amended Rule 803(3), effective January 1, 2022. The amendment does not make any substantive changes to the text of Rule 803(3) but merely adds a comma after the word "intent." The amendment also adds text to the comment that accompanies Rule 803(3), directing the reader to ***Fitzpatrick*** for assistance in understanding application of the rule.

Second, the testimony may be admissible if it is offered for its truth, in which case it is hearsay, and it satisfies the requirements of Rule 803(3). *Id.* at 472. Our Supreme Court explained that Rule 803(3) "renders admissible only those statements that reflect the 'declarant's then-existing state of mind . . . or condition[.]'" *Id.* (quoting Pa.R.E. 803(3)). Rule 803(3) generally does not permit admission of a "compound statement," which both evidences the declarant's state of mind and contains a factual assertion. *Id.* at 472-80. "That one aspect of a statement is admissible does not render all of a multi-part statement admissible. . . . Each aspect of the statement must satisfy a hearsay exception." *Id.* at 480 (footnote omitted).

Turning to the matter at bar, the record reveals Foster Mother testified on the first day of the termination hearing, April 7, 2021. Prior to the start of her testimony, counsel for Father objected preemptively to hearsay regarding conduct Foster Mother did not personally observe. N.T., 4/7/21, at 103-04. Counsel for OCY responded that Foster Mother would be offering statements by the Children, which were "admissible as the state of mind of the [C]hildren. It's relevant for the best interest determination, the statements they make relating to experiences of potential abuse in the birth family home and how they feel about going home." *Id.* at 105. Counsel for OCY asked the orphans' court to rule on the statements "as we get to them," and Father's counsel and the court agreed with this proposal. *Id.*

Counsel for Father subsequently objected again when counsel for OCY asked Foster Mother about behaviors she observed "that led [S.-A.T.] to be referred to trauma therapy[.]" *Id.* at 129-30. Counsel for Father asked that Foster Mother's testimony be limited to observed behaviors and not include "specific instances or allegations." *Id.* Counsel for OCY clarified that she was asking solely about behaviors at that time, and the orphans' court instructed Foster Mother to limit her testimony to observations and behaviors. *Id.* at 130.

Finally, counsel for OCY asked Foster Mother if the Children had made "statements to you about experiences in the birth home?" *Id.* at 131. Counsel for Father objected for a third time, and counsel for OCY requested that Foster Mother "be permitted to relay those statements that the [C]hildren have made that speak to any trauma or abuse they experienced in the birth family home to show their state of mind[.]" *Id.* at 132. The orphans' court ruled Foster Mother could testify as to the Children's "statements regarding their emotional well-being, their . . . statements about their emotional state of mind." *Id.* Counsel for Father contended that OCY was attempting to present statements describing specific instances of conduct, rather than the Children's state of mind, and asked the court to rule on that issue specifically. *Id.* at 132-33. Counsel for OCY seemingly agreed, explaining that she intended to present statements "the [C]hildren made that potentially constitute abuse or neglect as it's relevant to the state of mind of the [C]hildren . . . the best interest of

the [C]hildren regarding their feelings towards what they've experienced in the birth family home." *Id.* at 133. The court overruled counsel for Father's objection without further explanation. *Id.*

Counsel for OCY then elicited Foster Mother's disputed testimony, which was in narrative form and spanned several pages of transcript. As detailed below, Foster Mother testified as to statements by the Children that described alleged abuse and poor conditions in their parents' home. *Id.* at 134-38. The testimony also included questions that the Children asked and observations of their behavior. *Id.*

In Father's argument on appeal, he assails OCY's claim that it offered Foster Mother's testimony to prove the Children's state of mind, insisting, "the clear value of the evidence was to smear the parents with allegations of bad conduct." Father's Brief at 21. Even accepting that OCY offered the testimony to prove the Children's state of mind, Father adds, its evidentiary value was minimal. *Id.* He asserts that OCY investigated the allegations of abuse and deemed them unfounded.[6] *Id.*

We begin by assessing whether the Children's statements were hearsay. Foster Mother testified regarding myriad statements by the Children, not all

---

[6] The orphans' court did not address its decision to admit this testimony in its opinion issued following Father's appeal, though Father preserved a challenge to the testimony by making timely and specific objections and by including that challenge in his concise statements of errors complained of on appeal.

of which were similar in character. Upon review, we conclude several of the Children's statements were hearsay, while several of them were not.

As we explained, hearsay is an out-of-court statement offered to prove the truth of the matter it asserts. Pa.R.E. 801(c). Regarding statements the Children made describing specific instances of abuse or poor home conditions, it is plain the Children made the statements out of court, and that OCY offered the statements to prove their truth. Counsel for OCY did not indicate at the time counsel for Father objected that the statements were not being offered for their truth. To the contrary, she asked that Foster Mother be allowed to testify regarding "any trauma or abuse [the Children] experienced in the birth family home," implying that she was presenting the statements as describing factual events, the veracity of which the orphans' court should credit. N.T., 4/7/21, at 132. The statements included allegations that, while in the parents' care, the Children ate various "inedible objects," did not have beds, did not have running water, and did not have dinner every night. *Id.* at 134-35. In addition, the statements included allegations that the Children had frequented liquor stores, that gasoline was put in S.A.T.'s mouth, that Mother rolled up a car window on S.-A.T.'s neck, that the Children saw the parents engaging in sexual intercourse, and that multiple perpetrators sexually abused S.-A.T. *Id.* at 135-38. These statements were hearsay, and the court should not have admitted them absent an applicable exception.

Other statements by the Children and other aspects of Foster Mother's disputed testimony were not hearsay, however, and were admissible without resorting to an exception. This includes questions by the Children tending to incriminate the parents and observations of the Children's behavior. Foster Mother testified, for example, as to a conversation she had with S.A.T. and S.-A.T., during which they "asked me if my husband and I have sex, and they started acting it out and describing it[.]" *Id.* at 136. This portion of Foster Mother's testimony did not consist of out-of-court statements offered to prove the truth of the matter they asserted and was not hearsay. *See* Pa.R.E. 801, Comment ("Communications that are not assertions are not hearsay. These would include questions[.]").

Returning to the hearsay portion of Foster Mother's testimony, we next consider whether the state of mind exception applied to render the Children's statements admissible despite their hearsay character. Once again, a hearsay statement will be admissible under this exception if the statement indicates "the declarant's then-existing state of mind (such as motive, intent or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health)[.]" Pa.R.E. 803(3). The exception does not permit admission of "a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will." *Id.*

Here, the Children's statements did not indicate or suggest their mental states in terms of motive, intent, plan, or the like. They were also generally

- 11 -

not indicative of the Children's emotional, sensory, or physical condition, *i.e.*, how they were feeling when they made the statements. The statements, as Foster Mother presented them, were a litany of allegations regarding abuse or poor home conditions the Children experienced in their parents' care. They were statements of memory or belief offered to prove facts remembered or believed and were inadmissible pursuant to the plain language of Rule 803(3). Further, to the extent the statements were indicative of the Children's then-existing mental states, they were the sort of "compound statements" that our Supreme Court cautioned against in **Fitzpatrick**, which contained admissible state of mind components combined with inadmissible factual assertions. We conclude, therefore, that the orphans' court abused its discretion by admitting them into evidence.

It is important to add that we cannot find the abuse of discretion in this case to be harmless. "[F]inding harmlessness in a termination [of parental rights] case requires us to conclude that the evidentiary error could not have had any impact upon the orphans' court's decision." **A.J.R.-H.**, 188 A.3d at 1175. Our review of the record indicates that the orphans' court relied on the improperly admitted evidence when deciding to terminate Father's rights. In its oral opinion delivered at the conclusion of the hearing, the court referenced the evidence as follows:

> The foster mother testified as to the [C]hildren's extreme needs when they came into care, emotional needs, physical needs, medical needs. As I've mentioned, they had nutritional needs. At least one of the children was very underweight when

she came into foster care. The [C]hildren also reported themselves that they were not used to having a regular meal time, a regular schedule, consistency, safety, stability, and that in the foster home they were introduced to a regular meal time every evening at dinner, regular time for their medicines.

N.T., 4/8/21, at 202-03.

We acknowledge that nearly all the instances of alleged abuse or poor home conditions described in the improperly admitted evidence were noted in the record by multiple sources. For example, the orphans' court admitted into evidence OCY's "Case Timeline," which details referrals OCY received involving the Children, including alleged incidents involving gasoline, a car window being rolled up on a child's neck, and sexual abuse.[7] Exhibit OCY-10 at 2-4. The improperly admitted evidence may have had a corroborative effect, however, or caused the court to place more weight on these allegations than it otherwise would have. It is simply impossible for us to discern the extent to which this evidence tainted the court's decision to terminate Father's parental rights.

We conclude, therefore, that we must vacate the decrees terminating Father's parental rights to the Children and remand for the orphans' court to

_____

[7] The Case Timeline lists the allegations of abuse in terms of the referrals OCY received, the facts that the referrals alleged, and, in most cases, the results of OCY's investigations. While OCY deemed the referral pertaining to the car window, which was characterized as a General Protective Service report, "Valid," it deemed the referrals of sexual abuse, which were characterized as Child Protective Services reports, "Unfounded." Exhibit OCY-10 at 3-4. The Case Timeline does not indicate the result of any investigation relating to the referral involving gasoline. *Id.* at 2.

conduct a new termination hearing as soon as possible in accordance with our Rules of Evidence and case law, as discussed above. *See A.J.R.-H.*, 188 A.3d at 1179 (vacating the termination decrees and remanding for a new hearing due to improper admission of hearsay evidence). After the hearing, the court shall enter new decrees granting or denying termination.[8]

In reaching this conclusion, we emphasize what our Supreme Court explained decades ago in a different context: "When an agency having custody of a child petitions for termination of parental rights, the rights of the respective natural parents must be determined independently." *In re Burns*, 379 A.2d 535, 541 (Pa. 1977); *see also In re C.W.U.*, *Jr.*, 33 A.3d 1, 9 (Pa. Super. 2011) (reversing the trial court in part, where the court had improperly "treated the termination Petitions regarding Father and Mother as inextricably intertwined.").[9] Though the orphans' court terminated Mother's parental rights, and this Court affirmed that termination on appeal, the orphans' court may not hasten to terminate Father's parental rights merely because of his association with Mother. While the possibility that Father could endanger the

---

[8] Due to our disposition of Father's fourth claim, we need not consider his first, second, and third claims.

[9] *Burns* involved the issue of whether a trial court could terminate the rights of one parent when it had declined to terminate the rights of the other parent, and *C.W.U.*, *Jr.*, involved the issue of whether a trial court could decline to terminate the rights of one parent simply because it had already declined to terminate the rights of the other parent. While these cases involved different situations than the matter at bar, we find the legal principle that they applied to be pertinent.

Children by exposing them to Mother in the future may be relevant at an upcoming termination hearing, that hearing should center on Father and the extent to which *he* is able to parent the Children, mindful of his constitutional right to their care and custody, and the "clear and convincing" burden of proof. *See Santosky v. Kramer*, 455 U.S. 745, 753-69 (1982). Relatedly, it also is important to recognize the relative tenuousness of the evidence thus far supporting termination of Father's parental rights. The record shows Father complied with various OCY services, and he is listed as being in "moderate" compliance on every permanency review order in the record that indicates his compliance level. He completed parenting and anger management classes, as well as a substance abuse evaluation, which did not recommend substance abuse treatment. N.T., 4/8/21, at 42, 55, 78, 81. Though the evaluation was based entirely on Father's self-reporting, he provided negative urine screens throughout the case, which seemingly confirmed that he was not using illegal substances. *Id.* at 42, 53. In addition, Father obtained housing by the time of the hearing on April 7, 2021, and April 8, 2021, and provided OCY with documentation of his income on two occasions. *Id.* at 29-32, 40-41, 76, 82-83. While he visited the Children inconsistently at the beginning of the case, he had been compliant since January 2020, except for "a few latenesses" and a visit that needed to be rescheduled. *Id.* at 36-39. Father's participation in medical and educational appointments also improved. The record reveals OCY did not initially have a procedure for notifying the parents of the Children's

appointments. *Id.* at 70. Foster Mother began notifying the parents of the Children's appointments in September 2020, and they participated in seven of the approximately fourteen appointments about which they were notified after that time. N.T., 4/7/21, at 145-46, 163. We would expect that upon rehearing that only admissible evidence will be considered in determining whether, by clear and convincing evidence, Father's parental rights should be terminated, regardless of any considerations that led to termination of Mother's parental rights, unless it can be shown that Father's conduct vis a vis Mother has some bearing on the termination considerations relevant to some provision under Section 2511(a).

Decrees vacated. Case remanded for further proceedings. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/18/2022