J-S19017-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| TERMINATION OF PARENTAL RIGHTS TO: H.J.P., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: N.I.L., II, FATHER | : : : : : : : | |
| | : | No. 185 MDA 2023 |

Appeal from the Order Entered December 2, 2022
In the Court of Common Pleas of Schuylkill County Orphans' Court at
No(s):  A63-021-2022

BEFORE:  BENDER, P.J.E., McLAUGHLIN, J., and SULLIVAN, J.

MEMORANDUM BY McLAUGHLIN, J.:        **FILED: JULY 25, 2023**

N.I.L., II ("Father") appeals from the order terminating his parental rights to H.J.P. ("Child"). He argues the court erred in finding grounds for termination under 23 Pa.C.S.A. §§ 2511(a)(1) and (b) and that the court erred in relying on the recommendation of Child's attorney/guardian ad litem. We affirm.

In April 2022, H.V. ("Mother") filed a petition to terminate Father's parental rights, to allow for her husband, P.V., to adopt Child. Child was born in July 2019, and was approximately two years and nine months old. The court appointed counsel for Father and for Child.

At a November 2022 hearing, counsel for Child stated that she had met with Child on two occasions. She opined that because of Child's age, he did not understand adoption, but she believed she could speak on his behalf

relative to his best and his legal interests. All parties agreed that Child's counsel could represent Child's legal and best interests.

The trial court's opinion sets forth the factual history in full. **See** Trial Ct. Op., filed Dec. 2, 2022, at 1-9, ("1925(a) Op."). In summary, Father, Mother, P.V, and Child's paternal grandfather, N.I.L. ("Grandfather"), testified at the hearing. Mother has had custody of Child since birth. During Child's first year, Father saw Child sporadically. In September 2019, Father initiated a custody action. In December 2019, the court entered a custody order wherein the parties shared legal custody and Mother had primary physical custody. Father had custody every other weekend from Friday until Sunday. Father did not follow the schedule, often not exercising his custody times.

From February 2020 until June 2020, Father was incarcerated. He did not attempt to contact Child during this time. When he was released from prison, he contacted Mother and scheduled a visit in August 2020, which his parents attended but he did not.

Mother filed for child support at an unspecified time. Father was ordered to pay $400 per month. He paid child support only once, after he was arrested for failure to pay the support.

From June 2020 to December 2020, Father did not have regular contact with Child, and he did not send gifts or cards. From January through June 2021, Father had irregular contact with Child, often missing visits. In June 2021, Father was again incarcerated. Father's parents had visits with Child in August 2021, winter of 2021, and February 2022, where Father may have

spoken on the phone with Child. While he was incarcerated, Father did not contact Mother or send letters inquiring about Child.

Prior to his incarceration, Mother invited Father to attend Child's doctor appointments, but he did not do so.

P.V. has been in Child's life for two years and began living with Mother and Child in August 2021. P.V. expressed his love for Child, and testified he had a good relationship with Child, who calls him "Daddy."

Father testified that he lives in a room in a building with three other men and is on state parole. Although he has a job where he earns $20.00 per hour, he has not paid child support.

The court credited the testimony presented by Mother and found the evidence presented by Father, "in particular that presented via the testimony of [Grandfather], [was not] credible in numerous material respects." 1925(a) Op. at 9.

The trial court entered an order terminating Father's parental rights. Father appealed.

Father raises the following issues:

> A. Whether the trial court erred and/or abused its discretion in terminating Father's parental rights?
>
> B. Whether the trial court erred and/or abused its discretion in relying upon the recommendation of the Child's attorney/guardian ad litem where the Child's attorney/guardian ad litem did not interview Father in-person and where the Child's attorney/guardian ad litem failed to observe Father with Child?

Father's Br. at 4 (suggested answers and some capitalization omitted).

Father argues Mother did not prove he had failed to perform parental duties. He points out he was incarcerated from June 2021 through June 2022, and claims he had been exercising periods of custody prior to his incarceration. He argues that he had video chats and phone calls with Child while he was incarcerated when Child was with his paternal grandparents ("Paternal Grandparents"). He claims that Mother was clear she would not support Father's relationship with Child during his incarceration. Father notes that incarceration alone is not sufficient to demonstrate a parent abandoned a child, and argues the court erred in finding he failed to maintain contact with Child. He argues the court erred in crediting Mother's testimony as to the number of times Child saw Paternal Grandparents, as she had "every incentive to be less than forthcoming." *Id.* at 21.

He further argues even if Mother's testimony is deemed credible, "when viewed with the totality of the evidence, [it] was neither clear nor convincing." *Id.* Father claims he scheduled video calls when Child was with Paternal Grandparents, and although "it is arguable that Father could have done more to assert himself as the Child's parent, these calls are sufficient proof that Father has not evidenced a settled purpose of relinquishing parental claim to the Child." *Id.* Father claims the court also erred by "ignoring Mother's efforts to thwart and discourage Father's relationship with the Child," alleging Mother did not let Child visit Father in prison and "clearly stated to Paternal Grandparents that she did not want Father to have contact with the Child during his incarceration." *Id.* at 22. He claims his period of incarceration was

- 4 -

"relatively short-term," he had been involved in Child's life prior to incarceration, and he attempted to reinsert himself in Child's life after the incarceration. Father states that although Child is bonded with Mother's husband, P.V., "there is room in the Child's life for both men to exist." *Id.* at 23, 24-25. He claims the court erred in basing a finding that no harm would come to Child from termination on the fact that Child did not remember Father, stating that it was an "oversimplifi[cation of] the life-long impact the termination of parental rights will have on the Child." *Id.* at 25.

When we review termination of parental rights cases, we "accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citation omitted). "If the factual findings have support in the record, we then determine if the trial court committed an error of law or abuse of discretion." *In re Adoption of K.C.*, 199 A.3d 470, 473 (Pa.Super. 2018). We may reverse a trial court's decision in a termination case "for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012).

A party seeking to terminate parental rights has the burden of establishing grounds for termination by clear and convincing evidence. *See In re Adoption of K.C.*, 199 A.3d at 473. Clear and convincing evidence means evidence "that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *Id.* (citation omitted).

Termination of parental rights is controlled by Section 2511 of the Adoption Act. *See In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007). Under Section 2511, the trial court must engage in a bifurcated analysis prior to terminating parental rights:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*Id.* (citations omitted).

Here, the trial court terminated Father's parental rights pursuant to Subsection 2511(a)(1). That subsection provides:

> **(a) General rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S.A. § 2511(a)(1). "With respect to any petition filed pursuant to subsection (a)(1) . . . , the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S.A. § 2511(b).

Subsection 2511(a)(1) requires the moving party to prove by clear and convincing evidence that the subject parent engaged in "conduct, sustained

for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." *In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008). The parental obligation is a "positive duty which requires affirmative performance" and "cannot be met by a merely passive interest in the development of the child." *In re C.M.S.*, 832 A.2d 457, 462 (Pa.Super. 2003) (quoting *In re Burns*, 379 A.2d 535, 540 (Pa. 1977)). Indeed,

> [p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004) (citations omitted).

Here, the trial court concluded that Mother proved by clear and convincing evidence grounds for termination under Section 2311(a)(1). It reasoned, "Father did not put forth any reasonable effort to 'maintain a place of importance in the child's life.'" 1925(a) Op. at 10 (citation omitted). The court pointed out that Father did not exercise regular custody prior to his incarceration, did not provide monetary support for Child despite his testimony that he had been employed, did not attend Child's doctor visits or inquire about Child's health after the visits or provide gifts or letters or contact the

Child at Child's home while Father was in prison, and had only occasional contact while Child was with Paternal Grandparents. *Id.* The court found there was "no reliable explanation" for Father's failure to maintain contact with Child while in prison, finding that "[t]o the extent Father contends that Mother said or did anything to prevent . . . contact, such is not found credible." *Id.* at 11. Following review of the briefs, relevant statutory and case law, the trial court record, and the well-reasoned opinion of the Honorable Jacqueline L. Russell, we affirm the court's finding of grounds for termination under Section 2311(a)(1) on the basis of the trial court opinion. *Id.* at 9-11.

Under section 2511(b), the trial court must consider "the developmental, physical and emotional needs and welfare of the child" to determine if termination of parental rights is in the best interest of the child. **See** 23 Pa.C.S.A. § 2511(b). This inquiry involves assessment of "[i]ntangibles such as love, comfort, security, and stability." *Interest of K.T.*, --- A.3d ----, Nos. 37 & 38 WAP 2022, 2023 WL 4092986, at *14 (Pa. filed June 21, 2023) (quoting *In re T.S.M.*, 71 A.3d at 26). The court must examine any pre-adoptive home and any bond between the child and the foster parents. *Id.* Further, "if the child has any bond with the biological parent, the court must conduct an analysis of that bond[.]" *Id.* "[T]o grant termination when a parental bond exists, there must be clear and convincing evidence that the bond is not necessary and beneficial." *Id.* at *19. "[A]n 'adverse effect' or 'detrimental impact' of severance alone cannot demonstrate a necessary and beneficial bond." *Id.*

Further, "analysis of the parental bond is but one part of the overall subsection (b) analysis, which includes a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *Id.* at *18. "The Section 2511(b) inquiry must also include consideration of other important factors such as: the child's need for permanency and length of time in foster care consistent with 42 Pa.C.S. § 6351(f)(9) and federal law [the Adoption and Safe Families Act], 42 U.S.C. §§ 675(5)(C), (E); whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability." *Id.*

The trial court concluded that no harm would come to Child if Father's parental rights were terminated. Trial Ct. Op. at 11. It reasoned that Child did not recognize Father when they most recently saw each other. *Id.* at 11-12. Further, the court pointed out that P.V. "served the role of father for a lengthy period of time when considering [C]hild's young life, while Father either was incarcerated or had abandoned that role." *Id.* at 12. The court further reasoned that Father offered no satisfactory reason for failing to consistently contact Child during his incarceration. The trial court also found that the developmental, physical, and emotional needs and welfare of Child supports termination. It noted no emotional bond existed between Father and Child. It further pointed out that Child had been living with Mother and P.V., with whom

Child had a bond and a "wonderful relationship." *Id.* It concluded termination would serve Child's best interests. After reviewing the briefs, trial court record, relevant law, and the trial court opinion, we affirm the court's finding under Section 2511(b) on the basis of the trial court opinion. *Id.* at 10-12.

Father next claims that the court erred in relying on the recommendation of Child's attorney/guardian ad litem, reasoning the attorney had minimal contact with Father, whom she did not meet in person or observe with Child. He claims the attorney "was not open to information that would alter her premature conclusion that Father's rights should be terminated." Father's Br. at 16. Father maintains the attorney should have, at a minimum, met with him. He argues that she did not fulfill her duties and therefore the court erred in relying on her verbal report.

Father has waived this claim because he failed to raise it before the trial court. Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal"). Father never raised an objection to Child's attorney/guardian ad litem's ability to opine as to the legal and best interests of Child, and did not contend at any time before the trial court that the attorney/guardian ad litem should have met with Father.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 07/25/2023

**COURT OF COMMON PLEAS OF SCHUYLKILL COUNTY**
**ORPHANS' COURT DIVISION**

In Re:                                      :        No. A63-021-2022
H████ J████████ P████              :
            a Minor                 :        Contested Petition for Involuntary
                          :        Termination

Lori Schafer Guzick, Esquire – for the Petitioners
Michelle Jones, Esquire – for the Natural Father
Karen E. Rismiller, Esquire – Guardian ad Litem

**OPINION OF COURT**

RUSSELL, P.J.

On November 17, 2022, the Court held a hearing on the petition for involuntary termination of the parental rights of the natural father N████ l██ L████████, II (Father) to the child H████ J████████ P████ (born January ██, 2019). The petition was filed by the child's natural mother, H████ V███ (Mother), on April 11, 2022, and she seeks the termination of Father's rights pursuant to 23 Pa.C.S. 2511(a)(1), to allow for the adoption of the child by her husband, P███ V███. A hearing originally had been scheduled for July 25, 2022. Father appeared at that proceeding and requested that counsel be appointed to represent him. The Court appointed counsel for Father and the child.

Counsel for the child appeared at the November 17, 2022 hearing and represented that she had met with the child on two occasions. Because of his age, she opined that he did not understand the concept of adoption, and counsel believed she could speak on his behalf relative to his best and legal interests. All parties agreed that child's counsel could properly represent his best and legal interests.

Mother testified that she lives at a Pine Grove, Schuylkill County address with her husband R̶ V̶, whom she married on December 31. 2021. Mother is employed as an office manager for Susquehanna Dental East in Harrisburg. Mother has had custody of the child since birth. The natural parents never married, never resided together, nor were they in a relationship with each other after the child's birth.

During the child's first year, Father saw the child sporadically - sometimes he did not see the child for weeks or months at a time. In September 2019, Father filed a custody action. An agreement was entered at the initial custody conference in October. 2019. The agreement provided for Father to have the child every Wednesday and every other Saturday. Per the agreement, the alternating weekend custody periods would eventually expand to include Friday to Saturday, and later to Friday to Sunday. Father did not follow the schedule. He did not exercise custody on Wednesdays, nor every other weekend. The child was in Father's custody about four times from October, 2019 until the next custody conference occurred in December. 2019.

Father did not attend the conference. Father did not contact his attorney about the conference and, at the time of the Court's hearing herein, he did not recall his counsel's name. A custody order was entered December 18. 2019, providing for the parties to share legal custody of the child and Mother to exercise primary physical custody, with Father to exercise physical custody every other weekend from Friday until Sunday, together with various holidays. Father did not follow the custody schedule. Father did not visit the child on Christmas, 2019, although having been invited by Mother to do so. From February until June, 2020, Father did not contact the child. Father was in jail at the time but did not tell Mother. She did not receive any telephone

2

calls or letters from Father during this time. When Father was released from prison, he contacted Mother and a custody visit was set for a day in August, 2020. Father's parents came to the visit, but Father did not. Father's parents had no other contact with the child in 2020.

Mother filed for child support from Father at some unspecified time.[1] Father was ordered to pay child support of about $400.00 per month. However, Mother did not receive any child support. In March, 2021, a warrant was issued for Father's arrest due to his failure to pay child support. He then made a payment, and that was the only payment Mother received. Father testified that although he had been working at all times, except during periods he was incarcerated, that he did not know how to pay the support. The support action was terminated when Father went to prison in mid-2021, and it has never been reinstated. Father is required to pay $100.00 per month on the arrearages, which exceed $3,000.

From June, 2020 to December, 2020, Father did not have regular contact with the child, and he sent no gifts or cards. From January to June, 2021, Father had irregular contact with the child. Father often missed seeing the child in 2020 and 2021 for weeks or months at a time. In June, 2021, Father was incarcerated again. Father did not tell Mother about his incarceration but his parents did let her know about it in mid-July, 2021. Father's parents asked to visit with the child in July, 2021, and they visited one time in August, 2021. Additionally, the child visited with Father's parents one time in the winter of 2021 for a twenty-four-hour period, and one time in February, 2022. Father did not contact Mother or send her any letters inquiring about the child at any time while incarcerated. Mother's phone number had not changed during the

_____

[1] It appears that the child support action may have been instituted prior to the custody action Father initiated because Father requested a DNA test be performed in the support action.

3

relevant periods of time. The last time Father saw the child prior to April, 2022, when the petition for termination was filed, was May, 2021.

Mother did not prevent Father from exercising custody prior to his incarcerations. She also invited Father to attend the child's doctor appointments, but he attended none. He never asked her anything about the visits after they had occurred.

Mother has supported the child and provided parental care since his birth. Her husband also participates in feeding, clothing and providing a home for the child. Mother's husband P█ V█ is self-employed, running an HVAC and fabrication business. He has been involved in the child's life for about two years and began living with Mother and the child in August, 2021. To Mr. V█ knowledge, during the time he lived with Mother, Father never contacted her by phone, or sent cards or letters, or paid support for the child. Mr. █ has not done anything to interfere with Father's contact with Mother or the child. Mr. █ met Father the first time on the date of the initial hearing that had been scheduled in this case which was continued after Father appeared and indicated a desire to have counsel appointed to represent him in the proceedings. Mr. V█ met Father's parents one time when they had a visit with the child. To Mr. V█ knowledge, Father's parents had not sent anything to his home since he and Mother began to reside together. Mr. V█ expressed his love for the child. He has a good relationship with the child, who calls him "Daddy." The child and Mr. V█ engage in numerous activities together. Mr. V█ provides the child a home, emotional support, and he expressed his intent to raise the child to be a "respectful young man."

Father testified that he lives in a room in a building where three other men reside in York, Pennsylvania. He is currently on state parole. He is working and earns $20.00 per hour but has

4

not provided any support for his child. He has a one-year old daughter who does not reside with him. Father claimed that he had been denied visits with his child by Mother after the child was born. He then filed a child custody action. Father claimed that Mother had denied him custody visits about ten times after the custody order had been entered but that he saw the child consistently by the end of 2020. He later modified his testimony to indicate that he began exercising full weekend custody around January, 2021. Father testified on cross-examination that he did not exercise every other weekend custody but did not know why.

Father claimed that he saw the child for Christmas in 2019 and 2020, but gave him nothing in 2021. Father also claimed that he celebrated Easter, 2020, with the child, and that he did not celebrate other holidays that year except Thanksgiving. Father claimed he was seeing his child consistently during 2021 before his incarceration.[2] Father was in prison from June, 2020 to July, 2020. The imprisonment resulted because he had marijuana and paraphernalia in his possession and was detained on a probation violation. Father made no effort to contact Mother or the child during this time.

Father was incarcerated from June, 2021 to June, 2022, as the result of having a warrant issued for his arrest for another probation violation, and thereafter being revoked and sentenced to incarceration. He was also jailed for not paying child support. During the year incarceration he did not send any cards, gifts or letters to his child or contact Mother to ask about the child or to

---

[2] Father's testimony about custodial visits was inconsistent. He testified that he was denied custodial visits about ten times after the December, 2019 order was in effect, or that he was exercising custody every weekend after the entry of the order, or that only after the child turned two years old did he exercise weekend custody consistently. When Father was asked whether he began exercising full weekend custody after January, 2021, Father stated that he did not, but that he did not know the reason for the failure to do so.

5

talk to the child. Father claimed that he called his parents every day he was incarcerated and that he had two video calls to his parents involving "sporadic" contact with his child during this time. He also thought that he may have had two telephone calls that involved similar type contact with his child when the latter was with his parents.

Father claimed that Mother had notified him of the child's doctor appointments but that he did not attend the appointments because he either did not have a vehicle, did not have his parents provide him transportation to attend the appointments, or simply did not attend them after he had a vehicle. Father subsequently testified that he had remembered attending a few doctor appointments but did not know the name of the pediatrician or where the doctor had been located.

Father claims that he had been in the child's life as much as he could have, that he knows he had not done what he should have for the child but that he wants to do so now.

Father's criminal history includes a conviction in August, 2019 for theft, another 2019 conviction on two counts of controlled substance possession, a November 17. 2019 conviction for driving under the influence of a controlled substance and possession of controlled substance, an August, 2020 drug paraphernalia charge occurring after his release from prison in July, 2020 - with his being convicted of the offense in December 2021, and a May, 2020 driving under suspended/revoked license charge and subsequent conviction. The one-year term of incarceration on the 2019 theft offense was imposed after Father had been subject to numerous sentence revocations on that case.

Father admitted that the child did not know him when he last saw the child in September. 2022. The visit was arranged because after the initial scheduled hearing in this case, Father

showed up at Mother's house uninvited, claiming he was taking the child. He testified that after the first hearing that had been scheduled herein, he had texted Mother every day until she returned the messages. Father and Mother contacted the police. Mother's then-counsel advised her to file for emergency custody, but also suggested that Mother allow Father to see the child in the meantime so that she would not be held in contempt of the custody order. Mother set up to meet Father in Harrisburg, they met, and the child did not know Father. An emergency custody request was filed by Mother in the custody action filed in Cumberland County.[3] An order was entered in the custody action on August 29, 2022, allowing Father supervised visits. Father acknowledged that he did not have a relationship with the child.

Father's father N███ L████ testified that after the final custody order was implemented in December, 2019, custody was exercised by his son or by the grandparents with the child every other weekend. The last holiday he recalled celebrating with the child was his second birthday at which Mother hosted a party. According to Mr. L████, the last time the child was at the grandparents' home was February, 2022.[4] Mr. L████ testified that after Father was incarcerated, he and his wife continued to exercise custody with the child every other weekend. Mr. L████ claimed that Father called "all the time" that the grandparents had the child for the weekends, that Father communicated with the child "probably twice a day" each weekend day of those custody periods, and that he believed most of the calls were by video.

---

[3] Mother lived in Carlisle at the time the custody action had been initiated. Neither party lives in Cumberland County at this time.

[4] He also mentioned March 25, 2022 as a visit date but his testimony was not clear whether he actually meant a visit or a missed visit on that date.

Mr. L████ claimed that he had an agreement with Father that Father would pay Mother money to support the child, and that he knew that Father was providing "stuff" for the child to Mother. Mr. L████ never testified to having seen the support being paid or the items delivered. Mr. L████ stated that he had many texts inquiring of Mother whether the child needed anything. No corroborating evidence of the alleged texts was submitted during the hearing. Later, Mr. L████ testified that his wife was the person communicating with Mother and texting her about the child. His wife did not offer any testimony.

Mother testified on rebuttal that Father's parents did not exercise custody of the child every other weekend since the custody order had been entered, and that they only saw the child on three occasions between June, 2021 and February, 2022. Further, Mother claimed that she did not receive any alleged gifts for the child from Father or the grandparents, although she was asked at some unspecified time by Father's mother what the child would like for Christmas. Mother never received anything for the child for Christmas or his birthday from the grandparents and the child did not visit the grandparents for his birthday or Christmas.

The child's counsel met with the child twice, once in her office on August 10, 2022, and once at Mother's home on October 18, 2022. She found him to be very respectful, verbal and happy. He identified his mother and pointed to Mr. V████ when asked several times where his father was. He indicated having no recollection of Father. The child is very close to Mr. V████ Counsel did not find that Father has been an influence in the child's life and she believed that the termination of his parental rights would be in the child's best interest.

Upon a careful consideration of the evidence and close examination of the demeanor of the witnesses, the Court finds the evidence presented by Mother to be reliable and credible. The

evidence presented by Father, in particular that presented via the testimony of his father, is not found credible in numerous material respects. Notably, although Father claimed that while incarcerated he only had "sporadic" contact with his child on possibly four occasions when the child was visiting with his parents, the grandfather claimed that the grandparents had custody of the child every other weekend while Father was incarcerated until a visit was to occur in March, 2022. During that time, the grandfather testified that Father was in contact by phone or video once or twice every day. Similarly, the grandfather claimed – contrary to the testimony of Father and Mother – that custody was exercised consistently by Father/grandparents every other weekend after the entry of the December, 2019 custody order.

Mother seeks the involuntary termination of the parental rights of Father pursuant to 23 Pa.C.S. 2511(a)(1), which provides that the rights of a parent to a child may be terminated after a petition is filed on the grounds that "(t)he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties."

Id.

The statutory law further provides that:

> The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1),(6), or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

Id.

9

The Court has considered all of the evidence elicited at the hearing, including the varied explanations and excuses offered by Father for his actions and inactions, in determining whether his rights should be terminated. Upon examining the totality of the circumstances, it is found that clear and convincing evidence has been presented which proves the existence of the statutory grounds under 23 Pa.C.S. 2511(a)(1) for the termination of Father's parental rights. Although Father now states that he is interested in being bonded with his child, the child had "a right to essential parental care," throughout his young life. Although "(c)ommunciation and association" is "essential to the performance of parental duty," Father did not put forth any reasonable effort to "maintain a place of importance in the child's life." **In re: Adoption of C.M.**, 255 A.3d 343, 364 (Pa. 2021) (citations and quotations omitted). Despite Father's having initiated a custody action in 2019, at the apparent behest of his parents, he failed to exercise regular custody with his child when he was not in prison. Father never provided any regular monetary support for the child, despite his claims that he was always employed, and despite the fact that he apparently had been found in contempt for failing to pay support. Father's only payment of support resulted due to the contempt action. Father did not attend the child's doctor visits, and did not inquire about his health after the visits. Father did not provide the child gifts, letters or contact the child at the child's home while he was in county prison or incarcerated in a state institution. At most, Father had some limited interaction with the child on a few occasions when the child was with the grandparents during Father's daily calls to his parents.

A duty to love, protect, and support one's child exists, and requires a parent to actively achieve and maintain a prominent place in the life of the child. **In re: Adoption of M.J. H.**, 501

A.2d 648, 652 (Pa. Super. 1985). In this regard, where parents face challenging situations, they are to utilize available resources to overcome the challenges. **In re: Adoption of Dale A. II,** 683 A. 3d 297 (Pa. Super. 1996). Although Father's failure to support the child may, to a degree, be excused during the periods of incarceration, his duty to utilize "those resources at his...command while in prison in continuing a close relationship with the child" was not "tolled." **In re: Adoption of McCray,** 331 A.2d 652, 655 (Pa. 1975). Father clearly did not "exercise reasonable firmness 'in declining to yield to obstacles.'" Id. (citations omitted). In fact, no reliable explanation has been offered for Father's failure to maintain contact with the child during his incarceration. To the extent Father contends that Mother said or did anything to prevent that contact, such is not found credible. Father simply did not "affirmatively demonstrate love, protection and concern for the child." **In re: Adoption of Dale A. II,** at 115, supra. Likewise, Father did not "maintain communication and association" with the child. **In re: Adoption of M. J. H,** at 72, supra.

Having found that the proof establishes the statutory grounds for termination of parental rights, the following factors must be examined; (1) Father's explanations for his absences; 2) any post-abandonment contact between Father and child including efforts to re-establish contact; and 3) the effect upon the child of parental rights termination. **In re: Adoption of Charles E.D.M., II,** 708 A.2d 88 (Pa. 1998). The Court has considered the history of the case and totality of the circumstances, and Father's explanations for his conduct. First, no harm will come to the child as a result of the parental rights termination. Mother felt compelled to allow Father to see the child after the initial hearing that had been scheduled herein due to Father showing up uninvited at her home, and the advice she had received from her then-attorney. The child did not recognize

11

Father. His step-father has served the role of father for a lengthy period of time when considering the child's young life, while Father either was incarcerated or had abandoned that role. Besides his incarceration, Father offered no explanation for his absences: nor was a satisfactory reason provided for his failure to contact his child consistently during the year of incarceration, despite his contacting his parents every day. An analysis of the three factors does not modify the findings relative to the termination.

Finally, careful consideration of what will serve the best interests of the child, in view of his developmental, physical and emotional needs and welfare, pursuant to 23 Pa.C.S. 2511(b), also supports the termination. As indicated, no emotional bond exists between the child and Father. Consequently, as there is no bond to sever, no emotional harm with befall the child by the termination. The child has been living with Mother and her husband for a significant part of his life. He is bonded with his step-father, who has helped his wife in providing for and addressing all of the child's needs, including clothing, a home, food, and importantly. emotional support. The child has a wonderful relationship with the man he believes to be his father. As no harm would arise to the child by terminating the parental rights of Father, and the termination of those rights will serve his best interests, including his developmental, physical and emotional needs and welfare, Mother's request for relief is being granted.

12

## COURT OF COMMON PLEAS OF SCHUYLKILL COUNTY
## ORPHANS' COURT DIVISION

In Re:

H▦▦▦ J▦▦▦▦ P▦▦▦
     a Minor

:  No. A63-021-2022

:

:  Contested Petition for Involuntary

:  Termination

Lori Schafer Guzick, Esquire – for the Petitioners
Michelle Jones, Esquire – for the Natural Father
Karen E. Rismiller, Esquire – Guardian ad Litem

## FINAL DECREE

RUSSELL, P.J.

AND NOW, this _2nd_ day of December, 2022, upon consideration of the Petition for Involuntary Termination of the Parental Rights of N▦▦▦ I▦ L▦▦▦▦, II, as natural father, of H.J.P., minor child, and after hearing held thereon, it is ORDERED that the parental rights of N▦▦▦ I▦ L▦▦▦, II, to the child H.J.P., are TERMINATED, and the custody of H.J.P., is awarded to H▦▦▦ V▦▦, natural mother, subject to an adoption petition currently pending before this Court.

IT IS FURTHER ORDERED that the parent whose rights have been terminated is advised of his continuing right to place and update personal and medical history information, whether or not the medical condition is in existence or discoverable at the time of adoption, on file with the Court and with the Department of Public Welfare pursuant to Subchapter B of Chapter 29.

It is directed that all papers in this case and the testimony shall be withheld from public inspection and no person shall be allowed access thereto except upon Order of this Court granted upon cause shown.

BY THE COURT,

_Russell, P.J._