J-S44001-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: K.K., MOTHER | : | |
| | : | No. 2166 EDA 2023 |

Appeal from the Decree Entered July 21, 2023
In the Court of Common Pleas of Monroe County Orphans' Court at
No(s):  2023-00002

| | | |
|---|---|---|
| IN THE INTEREST OF: A.F.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: K.K., MOTHER | : | |
| | : | No. 2167 EDA 2023 |

Appeal from the Decree Entered July 21, 2023
In the Court of Common Pleas of Monroe County Orphans' Court at
No(s):  2023-00003

BEFORE:   OLSON, J., NICHOLS, J., and COLINS, J.[*]

MEMORANDUM BY OLSON, J.:                    **FILED FEBRUARY 29, 2024**

 K.K. ("Mother") appeals from the July 21, 2023 decrees involuntarily

terminating her parental rights to her sons, K.M, born January 2011, and

---

[*] Retired Senior Judge assigned to the Superior Court.

A.F.S., born November 2019 (collectively, "the Children").[1]  After review, we affirm.

We glean the following relevant factual and procedural history from the certified record.  On December 30, 2020, Monroe County Children and Youth Services ("CYS" or "the Agency") received a referral concerning Mother's mental health and alleged use of illegal substances.[2]  Specifically, Mother "was seeking help for her mental health.  At that time, she was diagnosed with [m]ajor [d]epressive [d]isorder, [a]nxiety, and [d]epression.  [S]he stated that she was experiencing fits of uncontrolled rage and . . . admitted to daily methamphetamine use [a]nd . . . to recently using heroin."  N.T., 6/16/23, at 15-16.  Mother tested positive for methamphetamine and amphetamine on January 20, 2021.  **See** Petitioner's Exhibit 21.  Thereafter, the Agency obtained protective custody of the Children on January 22, 2021, which was confirmed at a shelter care hearing on January 25, 2023.  **See** N.T., 6/16/23, at 24-25, 29.

On February 4, 2021, the court adjudicated the Children dependent and established their respective permanency goals as return to parent or guardian with concurrent goals of adoption.  Mother's permanency objectives included,

---

[1] By the same decrees, the orphans' court also terminated the parental rights of K.M.'s father, M.M., and A.F.S.'s father, C.S.  These individuals neither filed an appeal nor participated in the instant appeals.

[2] The family had come to the attention of the Agency on three prior occasions, dating back to May 2012, related to substance abuse and housing issues.  **See** N.T., 6/14/23, at 14-15.

in part, participating in drug and alcohol treatment and screening, engaging in mental health treatment, and maintaining safe and stable housing. **See** Petitioner's Exhibits 1 & 2. Mother was additionally required to participate in regular supervised visitation with the Children, and a referral was made to Justice Works for weekly supervised visitation. **See** Petitioner's Exhibit 18.

Throughout the ensuing dependency proceedings, the court conducted regular review hearings at which it maintained the Children's commitment and placement. During this time, Mother was charged with possession of a firearm with the manufacturer number altered in February 2022. The disposition and/or status of this charge is unclear from the certified record. **See** Petitioner's Exhibit 27. Mother additionally pleaded guilty to drug-related charges in April 2022[3] and was sentenced to six months' probation in June 2022. **See id.** The probation department filed a violation of probation petition in December 2022.[4] A bench warrant was issued the following month, in January 2023. **See id.**

On June 2, 2022, the Children's permanency goals were changed to adoption. **See id.** at 51, 78.

As to Mother's progress, the orphans' court stated:

---

[3] The record reflects unknown periods of incarceration in March and April 2022, the latter stemming from an April 2022 incident between Mother and her current paramour. **See** Petitioner's Exhibit 27; N.T., 6/14/23, at 48.

[4] We are unable to discern from the certified record the genesis of the probation violation.

. . .

13. Goals were discussed and services were offered to Mother, but she has not met any goals set forth in the Permanency Plan. . . .

. . .

16. While the [Children have] been in care, Mother has had continued use of drugs and violated the terms of her probation.

17. Mother has lacked stable housing and employment.

18. Mother appeared for at least one visit with [the Children] where she was under the influence. She also had injuries to her face at that visit that appeared to be from domestic violence.

19. Mother is currently unemployed and has a warrant outstanding for her arrest.

20. Mother last visited the [Children] in September 2022. She has had no contact with the [Children] since that date, and very little contact with CYS.

. . .

Orphans' Court Opinion and Decree, 7/21/23, at 3.[5]

On January 11, 2023, the Agency filed petitions for the involuntary termination of parental rights. The orphans' court held a hearing on the petitions on June 14, 2023, at which time the Children were twelve and three years old.[6] The Agency presented the testimony of the former caseworker,

_____

[5] While the orphans' court entered separate opinions and decrees for each child, as they are substantially similar, we will cite to the court's opinion and decree with respect to K.M. in the interest of clarity.

[6] On January 13, 2023, the orphans' court appointed Hillary A. Madden, Esquire, as the Children's legal counsel and guardian *ad litem* ("GAL"). The
*(Footnote Continued Next Page)*

Victoria Lipyanic, and current caseworker, Rachel Starkes.[7] The Agency further proffered Agency Exhibits 1 through 30, which were admitted without objection. *See* N.T., 6/14/23, at 70. Mother, while not present, was represented by counsel. She did not offer any additional evidence.

By opinions and decrees dated and entered July 21, 2023, the orphans' court involuntarily terminated Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b). On August 21, 2023, Mother filed timely notices of appeal at each docket number noted above, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[8] On August 28, 2023, the orphans' court issued

_____

certified record confirms that the Children's legal and best interests do not conflict. *See id.* at 60, 62, 71; *see also* 23 Pa.C.S.A. § 2313(a); *In re K.M.G.*, 240 A.3d 1218, 1238 (Pa. 2020) (holding appellate courts should engage in "limited *sua sponte* review" concerning a child's statutory right to counsel in the termination context).

[7] Ms. Lipyanic testified that she was involved with this matter from January 22, 2021, at the time the Agency took protective custody of the Children, until January 29, 2021, when the case was transferred to the Agency's Permanency Unit. *See* N.T., 6/14/23, at 27, 29. Ms. Starkes testified that she did not commence her role as caseworker until July 2022. *See id.* at 38.

[8] We note that Mother's time in which to file a timely appeal with respect to the orphans' court's decrees technically fell on August 20, 2023. *See* Pa.R.A.P. 903(a). Since that day was a Sunday, however, Mother's time in which to appeal was extended until Monday, August 21, 2023, by operation of statute. *See* Pa.R.J.A. 107(a)-(b) (relating to the computation of time and setting forth a rule of construction that excludes the last day of any period that falls upon a Saturday, Sunday, or legal holiday); Pa.R.A.P. 107 (incorporating by reference the rules of construction set forth in the
*(Footnote Continued Next Page)*

statements pursuant to Rule 1925(a) referencing the reasoning set forth in its prior opinions and decrees. On September 18, 2023, this Court consolidated Mother's appeals *sua sponte*.

On appeal, Mother challenges the sufficiency of the evidence pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b).[9] Mother's Brief at 4 (cleaned up). We review Mother's issue under an abuse of discretion standard, which our Supreme Court has explained "is limited to a determination of whether the decree of the termination court is supported by competent evidence." ***In re Adoption of C.M.***, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, appellate courts must accept the trial court's findings of fact and credibility determinations if they are supported by the record. ***See Interest of S.K.L.R.***, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." ***In re Adoption of L.A.K.***, 265 A.3d 580, 591 (Pa. 2021). An abuse of discretion in this context exists "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." ***Id***.

---

Pennsylvania Rules of Judicial Administration with respect to the Pennsylvania Rules of Appellate Procedure); ***see also*** Pa.R.A.P. 903, cmt.

[9] The Children's GAL/counsel filed a brief advocating for this Court to affirm the decrees.

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis. *See* 23 Pa.C.S.A. § 2511. The trial court must initially determine whether the conduct of the parent warrants termination under one of the eleven enumerated grounds set forth at Section 2511(a). Only if the court determines that the petitioner has established grounds for termination under Section 2511(a) does it then engage in assessing the petition under Section 2511(b), which focuses upon the child's needs and welfare. *See In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). To involuntarily terminate parental rights, the petitioner must satisfy both Section 2511(a) and (b) by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *C.M.*, 255 A.3d at 359 (citation omitted).

In the case *sub judice*, the orphans' court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b), which provide as follows:

> **(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

. . .

**(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

To establish grounds for termination pursuant to Section 2511(a)(1), "[a] petitioner. . . must demonstrate by competent, clear and convincing evidence, '[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.'" **C.M.**, 255 A.3d at 363-364 (citation omitted) (footnote omitted). While undefined,

our courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance and support. Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association. The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in the child's life.

**L.A.K.**, 265 A.3d at 592 (internal citations and quotation marks omitted). Furthermore, "[f]ortitude is required, as a parent must act with 'reasonable firmness' to overcome obstacles that stand in the way of preserving a

- 8 -

parent-child relationship and may not wait for a more suitable time to perform parental responsibilities." *Id.* at 592 (citation omitted).

In assessing Section 2511(a)(1), trial courts should consider the entire history of the case and avoid applying the statutory six-month requirement mechanically. *C.M.*, 255 A.3d at 364. However, the General Assembly's emphasis on the six months immediately preceding the filing of the termination petition indicates this timeframe is the "most critical period for evaluation" of a parent's conduct. *L.A.K.*, 265 A.3d at 592.

"[T]he question of whether a parent has failed or refused to perform parental duties must be analyzed in relation to the particular circumstances of the case." *In re Burns*, 379 A.2d 535, 540 (Pa. 1977). Thus, "even where the evidence clearly establishes a parent has failed to perform affirmative parental duties for a period in excess of six months. . ., the court 'must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination [of parental rights].'" *L.A.K.*, 265 A.3d at 593. The totality of the circumstances includes consideration of the following: "(1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between the parent and child, if any, including any efforts made by the parent to reestablish contact with the child; and (3) the effect that termination of parental rights would have on the child pursuant to Section 2511(b)." *Id.* As explained by our Supreme Court, "the purpose of this analysis is to give effect to our mandate that courts avoid

a mechanical application of the law regarding the termination of parental rights. The law must be applied with the purpose of serving needs and welfare of each individual child in his or her particular circumstances." *Id.*

Instantly, the orphans' court concluded that Mother failed to perform her affirmative duties, satisfying grounds for termination pursuant to Section 2511(a)(1). The court stated:

> In this case, [Mother has] failed to perform parental duties for a period exceeding the last six months. . . . The [Children have] been in foster care for two and a half years. Mother has continued to lack housing and employment and failed to remain drug free. She last visited with the [Children] in September 2022, after only [resuming] visits in July 2022. Mother did not appear at the [subject] hearing, nor did she provide any evidence as to her efforts to overcome her lack of performance of parental duties. She also had a warrant outstanding at the time of the [subject] hearing. CYS provided clear and convincing evidence for termination of parental rights under Section 2511(a)(1) as to Mother.

Orphans' Court Opinion and Decree, 7/21/23, at 8.

Mother nonetheless argues that she attempted to maintain communication with the Children and "a place of importance in their lives as their mother." Mother's Brief at 9-10. She further asserts that she suffered from substance abuse and mental illness and, as such, her conduct was reasonable. *See id.* at 10.

A review of the record supports the orphans' court's finding of grounds for termination under Section 2511(a)(1). The testimony of Ms. Starkes reveals that Mother declined to participate in services, but for a brief period

in the beginning of 2022, and failed to satisfy her objectives aimed at reunification with the Children. ***See*** N.T., 6/14/23, at 41, 65-66, 71, 83. On direct examination, Ms. Starkes stated:

> Q. As far as goals and objectives for each parent, let's talk about [Mother] for a moment. Has she achieved any kind of housing to the best of your knowledge?
>
> A. No.
>
> Q. To your knowledge, she is still homeless at this point?
>
> A. Correct.
>
> . . .
>
> Q. To the best of your knowledge, is she receiving any mental health services?
>
> A. None that I am aware of.
>
> . . .
>
> Q. And when was the last time she submitted any urine screens?
>
> A. I believe it was September of 2022 as well.

***Id.*** at 65-66.

Mother in large part failed to comply with drug screens. ***See id.*** at 37, 40-41, 46, 84; ***see also*** Petitioner's Exhibit 21. As evinced, she completed a total of four drug screens since the Children came into custody of the Agency[10]

---

[10] We observe that a screen collected on March 8, 2021, was positive for methamphetamine and amphetamine. ***See*** Petitioner's Exhibit 21.

and executed refusals[11] on 16 occasions from September 2021 through September 2022. **See** Petitioner's Exhibit 21. Similarly, despite several reported attempts, she failed to successfully complete a drug and alcohol evaluation and/or treatment. **See id.** at 35, 38, 40-46, 52, 55-57, 84.

As such, on cross-examination by counsel for Mother, Ms. Starkes confirmed:

> Q. Okay. And -- So -- And to date, mom has not achieved any of the goals laid out for her?
>
> A. No. **[Mother] hasn't met any of the goals, to my knowledge.** I haven't had contact with her since September 2022.

**Id.** at 71 (emphasis added).

Furthermore, Ms. Starkes testified that, as of January 1, 2022, Mother had cancelled her visitations for the last four weeks. **See id.** at 41. Over the next three months, Mother participated in a total of five visitations.[12] **See** Petitioner's Exhibit 18. Significantly, Mother's visitation was then placed on hold in April 2022 due to lack of contact. **See id.** at 48-49, 82; **see also** Petitioner's Exhibit 18. Ms. Starkes then testified that, after resuming visitation in July 2022, Mother had not engaged in visitation with the Children since September 2022, nearly one year prior:

---

[11] These refusals were executed in connection with Mother's visitation with Children. **See** Petitioner's Exhibit 21.

[12] Notably, Mother failed to show for two scheduled visitations in February 2022. **See id.**; **see also** N.T., 6/14/23, at 47.

Q. Has she not visited the children since September of 2022?

A. That's correct.

Q. So it's been almost a year since she visited with them?

A. Yes.

*Id.* at 65, 83; *see also* Petitioner's Exhibit 18.

Since that time, Mother had irregular telephone contact, until K.M. requested such contact cease. *Id.* at 71, 83. Ms. Starkes testified:

> Q. Has she -- up until the point where [K.M.] said he didn't want phone contact with [M]other, was she regularly contacting them after September of 2022?
>
> A. I think it was more sporadic. It was -- we tried to set up some type of schedule that way it didn't interfere with the foster parents' work schedules as well as [K.M.]'s extracurricular activities and bed times and things like that. But [Mother] was calling at any hour and would not leave the foster parents alone some days. Which got a little bit frustrating for them as well.

*Id.* at 83.

As such, the record supports the court's determination that Mother has failed to perform her parental duties in excess of the six months prior to the filing of the termination petitions. We reiterate, "[p]arental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others [meet] the child's physical and emotional needs." *In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citation omitted). Upon consideration of the totality of the circumstances, as we discern no error of law or abuse of discretion, we do not disturb the orphans' court's finding of grounds for termination pursuant to Section 2511(a)(1).

Having found sufficient grounds for termination pursuant to Section 2511(a)(1), we next must determine whether termination was proper under Section 2511(b), which affords primary consideration to the developmental, physical and emotional needs and welfare of the child. 23 Pa.C.S.A. § 2511(b). Of note, we "should consider the matter from the child's perspective, placing [his or her] developmental, physical, and emotional needs and welfare above concerns for the parent." *In the Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023). Moreover, this determination "should not be applied mechanically," but "must be made on a case-by-case basis," wherein "the court must determine each child's specific needs." *Id.* at 1106. Thus, there is no "exhaustive list" of factors that must be considered. *Id.* at 1113 n.28. While the particular facts of each case determine the factors to be considered, our precedent indicates that relevant points of inquiry include "intangibles such as love, comfort, security, and stability." *T.S.M.*, *supra* at 267.

Our Supreme Court has mandated, however, that an evaluation pursuant to Section 2511(b) should consider the child's bond with his or her parent. *See In re E.M.*, 620 A.2d 481 (Pa. 1993). Specifically, we must render "a determination of whether the bond is necessary and beneficial to the child[.]" *K.T.*, *supra* at 1113. This evaluation involves consideration of the effect of severing the child's bond with their parent. *Id.* at 1109. In termination matters, "severance of a necessary and beneficial relationship is

the kind of loss that would predictably cause 'extreme emotional consequences' or significant, irreparable harm." *Id.* at 1109-1110, *quoting* *E.M.*, *supra* at 484. Our Supreme Court has distinguished, however, "extreme emotional consequences" from a mere "adverse impact" in the termination context. *K.T.*, *supra* at 1111. Specifically, Pennsylvania courts must not truncate their analysis and preclude severance "based solely on evidence of an 'adverse' or 'detrimental' impact to the child." *Id.* at 1114.

Furthermore, "courts must not only consider the child's bond with the biological parent, but also examine the . . . love, comfort, security, and stability the child might have with the **foster** parent." *K.T.*, *supra* at 1111 (emphasis in original; cleaned up). Thus, we consider factors that arise from the facts of each case, such as: (1) the child's need for permanency and length of time in foster care; (2) whether the child is bonded with foster parents; and (3) whether the foster home meets the child's needs. *Id.* at 1113.

Overall, "bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." *Id.* at 1109.

In questioning the orphans' court's finding that Section 2511(b) also favors termination of her parental rights, Mother argues that it is "impossible" that no bond exists between she and the Children, referencing in part her visitations and telephone calls. She maintains, "[t]his bond deserves a closer

look so that the severance of that relationship can be thoroughly examined." Mother's Brief at 12.

Moreover, Mother posits that she unsuccessfully requested services to address her relationship with K.M. *See id.* at 12. Further, while recognizing that K.M. requested her telephone calls stop, Mother questions his relationship with his foster parents, stating, "[t]estimony established that [K.M.] was still not at a comfort level to refer to his foster parents as 'mom' and 'dad,' which raises questions as to whether being adopted best serves his welfare." *See id.* at 12-13.

At the time of the June 2023 termination proceeding, the Children had been removed for approximately two and a half years. As indicated *supra*, the record reveals several gaps in Mother's visitation and contact with the Children and that she had not engaged in visitation with the Children since September 2022. *See* N.T., 6/14/23, at 36, 41, 47, 49, 57, 59, 65, 83; *see also* Petitioner's Exhibit 18.

Despite sporadic telephone calls since that time, in April 2023, K.M., then twelve years old, requested the telephone calls with Mother stop. Ms. Starkes testified:

> Q. Do you know if mom had [tele]phone contact with the boys since September of 2022?
>
> A. She's tried contacting the boys by [tele]phone, and I think she's had a few [tele]phone calls. However, at a point in time, [K.M.] had asked to no longer speak with her on the [tele]phone. And due to [A.F.S.] only being 3, he doesn't really interact on the [tele]phone.

. . .

*Id.* at 71; *see also id.* at 62 ("[K.M.] had also informed me that he no longer wanted to speak with [Mother] and had asked the foster parents to stop asking him to have [tele]phone calls with her."), 82. Further, Ms. Starkes indicated that K.M.'s visitation with members of his biological family caused him to suffer distress. *See id.* at 62, 80-81 ("[K.M.'s] behaviors ha[d] been declining ever since he had a visit with his maternal grandmother. . . . At that point, I was told [K.M.] disclosed to his therapist that he was acting out due to seeing his biological family members.").

As a result, Ms. Starkes, reported K.M.'s wishes to not reunify with Mother:

> Q. Okay. And did the boys -- did they desire to be reunited with mom?
>
> A. I'm sorry, can you repeat that?
>
> Q. Do you know if the boys desire to be reunited with mom?
>
> A. N -- I've discussed with [K.M.] and he said he would like to be adopted by the [foster parents] and that he did not want to remain -- he did not want to go back to [Mother].

*Id.*

Moreover, the Children, twelve and three years old at the time of the subject proceeding, had been placed together in their current pre-adoptive foster home for a year and a half. *See id.* at 64. Ms. Starkes observed that the Children were doing well with their medical and physical needs met. *See*

*id.* K.M. was engaged in outpatient therapy.[13] ***See id.*** His current therapist

expressed support for termination of parental rights. ***See*** Petitioner's Exhibit

6. A.F.S. was enrolled in early intervention services.[14] ***See id.*** at 64.

Significantly, Ms. Starkes observed a bond between the Children and

their foster parents. Ms. Starkes described:

> [A.F.S.] is identifying both his foster parents as his mom and dad. He's very attached and bonded with [foster mother] especially, but he has a good bond with both the foster parents. As far as [K.M.] is concerned, he is very bonded to both foster parents as well. Although he is not a comfort level, I think, of calling them mom and dad. He does still sometimes call them [by their first names]. But he still wishes to be adopted by them.

*Id.* at 65. She further explained:

> Myself and the foster-care coordinator took [K.M.] out for dinner to discuss the [subject] hearing coming up. We discussed everything with [K.M.] and let him ask questions, although he didn't have any. We confirmed with him that he would have no contact with his biological parents if this termination went through and he got adopted by his foster parents. [K.M.] seemed very comfortable with that and said that he wanted to be adopted with his brother, [A.F.S.].

*Id.* at 60.

Based upon the foregoing, we conclude that the record corroborates the

orphans' court's determination that termination of Mother's parental rights

---

[13] K.M. had been engaged in therapy with various providers since the spring of 2021. ***See*** N.T., 6/14/23, at 36; ***see also*** Petitioner's Exhibits 5-7.

[14] A.F.S. had been engaged in early intervention services since the spring of 2022. ***See id.*** at 45; ***see also*** Petitioner's Exhibit 11. He had also previously received behavioral, occupational, and speech therapy. ***See id.*** at 57; ***see also*** Petitioner's Exhibits 12 & 13.

best serves the Children's developmental, physical, and emotional needs and welfare pursuant to Section 2511(b). As such, we do not disturb it. Since our review confirms that there was a sufficient basis for the involuntary termination of Mother's parental rights pursuant to Section 2511(a)(1) and (b), we affirm the orphans' court's decrees.

For the foregoing reasons, we affirm the termination decrees.

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/29/2024