J-S01032-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE MATTER OF: M.B.T., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.A., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1605 MDA 2024 |

Appeal from the Decree Entered September 25, 2024
In the Court of Common Pleas of Dauphin County Orphans' Court at
No(s):  44-ad-2024

| | | |
|---|---|---|
| IN THE MATTER OF: B.M.T., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.A., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1606 MDA 2024 |

Appeal from the Decree Entered September 25, 2024
In the Court of Common Pleas of Dauphin County Orphans' Court at
No(s):  45-AD-2024

BEFORE:   NICHOLS, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                   **FILED: MARCH 4, 2025**

R.A. ("Father") appeals from the September 25, 2024 decrees that involuntarily terminated his parental rights to his twin daughters, M.B.T. and

_____

[*] Former Justice specially assigned to the Superior Court.

B.M.T., born in October 2018 (collectively, "the Children").[1]  Upon review, we affirm.

We glean the following relevant factual and procedural history from the certified record.  During the winter of 2017 and 2018, Father met Mother who, at the time, was homeless.  ***See*** N.T., 9/25/24, at 66.  Because Mother was homeless, he permitted her to reside with him in his home in New Jersey.  ***See id.***  While living together, Father and Mother briefly engaged in an intimate relationship.  ***See id.*** at 66-67.

As best we can discern, Mother left Father's home sometime during 2018, before giving birth to the Children in October 2018.  ***See id.***  Thereafter, in the summer of 2019, the New Jersey Division of Child Protection and Permanency ("DCPP") obtained legal and physical custody of the Children due to concerns about their safety in Mother's care.  ***See id.*** at DCCY Exhibit 1.  Specifically, Mother had left the Children, who were less than a year old at the time, unsupervised, and she cared for them while intoxicated.  ***See id.***  In September 2019, DCPP sent a letter to Father that included an order entered by the New Jersey family court in July 2019, which mandated that Father obtain a paternity test because Mother had informed DCPP that he may be the Children's biological father.  ***See id.***

_____

[1] By separate decrees entered July 29, 2024, the court involuntarily terminated the parental rights of the Children's biological mother, O.T. ("Mother").  She did not appeal.

Although Father denied paternity, he permitted Mother and the Children to reside with him once she ultimately regained custody of the Children. *See id.* at 18, 66-68. However, in 2020, Mother and the Children moved to Pennsylvania, and Father had no further contact with them. *See id.* at 68-69, 87-88.

Dauphin County Social Services for Children and Youth ("DCCY" or "the Agency") first became aware of Mother and the Children in October 2022. On October 8, 2022, DCCY received a report that Mother and the Children had been sitting outside in the cold at 3:00 a.m. However, DCCY could not locate the family thereafter. Then, on October 24, 2022, DCCY received another report from the Steelton Police Department that Mother and the Children were homeless and sleeping in the stairwell of a building. *See* N.T., 7/29/24, at 21-22. The report indicated that Mother was heavily intoxicated, and the Children were soaked in urine, malnourished, and wearing ill-fitting clothing. *See id.* Accordingly, the Agency was awarded emergency custody of the Children.

Following a shelter care hearing on October 24, 2022, the court ordered temporary physical and legal custody of the Children to DCCY. On November 2, 2022, the court adjudicated the Children dependent and placed them in a foster placement with S.T. ("foster mother"), where they have remained throughout these proceedings.

On November 10, 2022, DCCY established contact with Father by telephone and made him aware of the circumstances surrounding the Children's removal from Mother's care. ***See*** N.T., 9/25/24, at 8. Although Father's paternity had not yet been established, on November 16, 2022, DCCY forwarded Father information concerning the Children's placement and instructions regarding his opportunity to engage in visitation with the Children. ***See*** N.T, 7/29/24, at DCCY Exhibit 2. The letter also contained contact information for DCCY. ***See id.*** DCCY caseworker, Amber Torres, contacted Father again in December 2022, to inform Father that they would need to assess his home. ***See*** N.T., 9/25/24, at 10-11, 31. In response, Father stated that he could not be a resource for the Children at that time because he was remodeling his home.[2] ***See id.*** at 23, 31.

The court established a singular goal for Father, *i.e.*, present himself to DCCY to be assessed. ***See id.*** at 12. DCCY needed to, *inter alia*, assess Father's home, however, as Father resided in New Jersey, DCCY was required to initiate an Interstate Compact for the Placement of Children ("ICPC").[3] To

---

[2] Ultimately, when DCCY reached out again to Father in May 2024, he informed the Agency that his home was finally finished being remodeled, and it was ready for the Children. ***See*** N.T., 9/25/24, at 31.

[3] ***See*** 62 P.S. § 761. The purpose and policy of the ICPC is as follows.

> It is the purpose and policy of the party states to cooperate with each other in the interstate placement of children to the end that:

*(Footnote Continued Next Page)*

initiate the ICPC, the Agency needed to confirm Father's paternity of the Children.[4] During the ensuing months, DCCY repeatedly requested that Father provide proof of parentage. *See id.* at 13-18, 48. In addition, in May 2023, Father provided DCCY with documentation that he believed confirmed his parentage of the Children. *See id.* at 14-15. However, Father merely provided a New Jersey child protection order entered July 17, 2019, which stated that the court in New Jersey had ordered Father to undergo paternity testing. *See id.* at 14-15; DCCY Exhibit 1.

_____

(a) Each child requiring placement shall receive the maximum opportunity to be placed in a suitable environment and with persons or institutions having appropriate qualifications and facilities to provide a necessary and desirable degree and type of care.

(b) The appropriate authorities in a state where a child is to be placed may have full opportunity to ascertain the circumstances of the proposed placement, thereby promoting full compliance with applicable requirements for the protection of the child.

(c) The proper authorities of the state from which the placement is made may obtain the most complete information on the basis of which to evaluate a projected placement before it is made.

(d) Appropriate jurisdictional arrangements for the care of children will be promoted.

*Id.* at Art. I (Purpose and Policy).

[4] Father is not listed on the Children's birth certificates. *See* N.T., 9/25/24, at 16.

Throughout the course of the Children's dependencies, the court held regular permanency review hearings at which Father failed to appear, despite notice.[5] The court maintained the Children's commitment and placement.

On March 18, 2024, DCCY filed petitions seeking the involuntary termination of Father's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), and (b). The Children's guardian *ad litem* ("GAL") from their respective dependency cases fulfilled the same role in the termination proceedings. The GAL filed a motion requesting that the orphans' court appoint separate legal interest counsel for the Children because she believed a conflict may exist due to the Children's desire to return to Mother. **See** Motion, 5/8/24. Accordingly, in compliance with Section 2313(a) of the Adoption Act, the court also appointed Jeffrey Clark, Esquire, as legal interest counsel for the Children. **See** Order, 5/13/24; **see generally In re Adoption of K.M.G.**, 240 A.3d 1218, 1234-36 (Pa. 2020).

The orphans' court conducted an evidentiary hearing on September 25, 2024, at which time the Children were five years old.[6/7] DCCY presented the

_____

[5] Father may have attempted to attend one hearing virtually, but he was disconnected. **See** N.T, 9/25/24, at 11.

[6] In May 2024, the court made a finding of aggravated circumstances against Father due to his lack of contact with DCCY and the Children. **See** N.T., 9/25/24, at 24.

[7] The hearing solely concerned DCCY's petitions seeking the involuntary termination of Father's parental rights as Mother's rights were previously terminated by the orphans' court in July 2024. **See** *supra*, n.1.

testimony of Ms. Torres; foster mother; DCCY casework supervisor, Tiffany Burston; and as a rebuttal witness, Diakon Adoption and Foster Care caseworker, Kelly Smith. Father testified on his own behalf.

Ms. Torres testified that over the course of the Children's dependencies, she emphasized to Father the importance of visitations and contact with the Children, but he never visited them. *See id.* at 19, 30. Further, despite DCCY's numerous requests for Father to provide proof of his parentage, Ms. Torres testified that Father ultimately acknowledged his paternity in a New Jersey child support case involving the Children which was reflected by a New Jersey court order dated December 15, 2023.[8] *See id.* at 13-14, 44, 48; *see also* DCCY's Petition for Involuntary Termination, 3/18/24, at Exhibit B. Due to the length of time it took to substantiate Father's paternity, DCCY did not initiate the ICPC as it had already determined that it would be filing termination petitions. *See* N.T., 9/25/24, at 34-35.

Father disputed that Ms. Torres contacted him frequently, stating that he only spoke with her two or three times. *See id.* at 96-97. Father also testified that he did not receive notice for any of the proceedings. *See id.* at 88-89. Father reiterated that he did not receive much contact from DCCY and that, in regard to his home, he assumed DCCY would reach out to confirm if his home was ready for the Children. *See id.*

---

[8] Ms. Torres testified that DCCY did not receive the order until March 2024. *See* N.T., 9/25/24, at 44, 48.

Foster mother testified that the Children have ongoing medical concerns. *See* N.T., 9/25/24, at 54. She also stated that the Children are doing very well, attend occupational therapy and play therapy, and recently began full-day kindergarten. *See id.* at 54-55.

By decrees filed on September 25, 2024, the orphans' court involuntarily terminated Father's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), and (b). The orphans' court provided a brief rationale for its decision on the record in open court at the close of proceedings on September 25, 2024. *See id.* at 111-112.

Father timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On November 13, 2024, this Court consolidated Father's appeals *sua sponte*. On November 21, 2024, the orphans' court filed its Rule 1925(a) opinion.

On appeal, Father presents the following issues for our review:

1. Whether the orphans' court erred as a matter of law and/or abused its discretion in concluding that DCCY met its burden of providing, by clear and convincing evidence, that Father had refused or failed to perform parental duties for a period of at least six months prior to the filing of the petition seeking the involuntary termination of his parental rights, pursuant to 23 Pa.C.S.A. § 2511(a)(1)?

2. Whether the orphans' court erred as a matter of law and/or abused its discretion in concluding that DCCY met its burden of proving, by clear and convincing evidence, that Father's conduct was irremediable and therefore justified the involuntary termination of his parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2)?

3. Whether the orphans' court erred as a matter of law and abused its discretion by engaging in a best-interest analysis, pursuant to 23 Pa.C.S.A. § 2511(b), without clear and convincing evidence first provided by DCCY to establish the required grounds under 23 Pa.C.S.A. § 2511(a)?

Father's Brief at 5-6 (cleaned up).[9]

Our standard of review in this context is well-established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence,

_____

[9] The Children's GAL filed a brief in support of affirming the decrees involuntarily terminating Father's parental rights. In lieu of a brief, the Children's legal interest counsel filed a letter stating that the Children "have never mentioned [] Father nor voiced a desire to be reunited with him." Letter, 1/7/25.

which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

***Interest of M.E.***, 283 A.3d 820, 829-30 (Pa. Super. 2022) (cleaned up).

The involuntary termination of parental rights is governed by section 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. ***Id.*** at 830; ***see also*** 23 Pa.C.S.A. § 2511(a)(1)-(11). If the trial court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013); ***see also*** 23 Pa.C.S.A. § 2511(b). This Court need only agree with the orphans' court's determination as to any one subsection of section 2511(a), in addition to section 2511(b), in order to affirm termination. ***See M.E.***, 283 A.3d at 830 (citing ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*)).

Our analysis in this case will focus upon section 2511(a)(1) and (b),[10] which provides as follows:

---

[10] By analyzing only section 2511(a)(1), we draw no conclusions regarding whether the evidence supported termination under section 2511(a)(2), *i.e.*, the other subsection by which the orphans' court involuntarily terminated Father's parental rights. ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

. . .

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

In order to establish grounds for termination pursuant to section 2511(a)(1), "[a] petitioner. . . must demonstrate by competent, clear and convincing evidence, '[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.'" *In re Adoption of C.M.*, 255 A.3d 343, 363-64 (Pa. 2021); *see also* 23 Pa.C.S.A. § 2511(a)(1).  While undefined,

our courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance and support.

- 11 -

> Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association. The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in the child's life.

*In re Adoption of L.A.K.*, 265 A.3d 580, 592 (Pa. 2021) (internal citations and quotation marks omitted).

In assessing section 2511(a)(1), trial courts should consider the entire history of the case and avoid applying the statutory six-month requirement mechanically. *C.M.*, 255 A.3d at 364. However, the General Assembly's emphasis on the six months immediately preceding the filing of the termination petition indicates this timeframe is the "most critical period for evaluation" of a parent's conduct. *L.A.K.*, 265 A.3d at 592.

"When considering a request to terminate parental rights under Section 2511(a)(1), a parent's failure or refusal to perform parental duties 'must be analyzed in relation to the particular circumstances of the case.'" *Id.* (citing *In re Burns*, 379 A.2d 535, 540 (Pa. 1977)). Thus, "even where the evidence clearly establishes a parent has failed to perform affirmative parental duties for a period in excess of six months. . ., the court 'must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination [of parental rights].'" *Id.* at 593. The totality of the circumstances includes consideration of the following: "(1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between

the parent and child, if any, including any efforts made by the parent to reestablish contact with the child; and (3) the effect that termination of parental rights would have on the child pursuant to Section 2511(b)." **Id.** A finding that a parent has refused or failed to perform parental duties "will not be predicated upon parental conduct which is reasonably explained or which resulted from circumstances beyond the parent's control," but may "only result when a parent has failed to utilize all available resources to preserve the parental relationship." **Id.** at 592. (citing **Burns**, 379 A.2d at 540).

If the trial court concludes that adequate grounds for termination exist pursuant to section 2511(a), the court then turns to section 2511(b), which requires that it "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b); **see also T.S.M.**, 71 A.3d at 267. Our Supreme Court has directed that a section 2511(b) inquiry must include consideration for the bond between the parent and the child. **In re E.M.**, 620 A.2d 481, 485 (Pa. 1993). Our Supreme Court has further explained that "[i]t is only a necessary and beneficial bond, after all, that should be maintained." **Interest of K.T.**, 296 A.3d 1085, 1109 (Pa. 2023). "However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists." **In re Adoption of J.M.**, 991 A.2d 321, 324 (Pa. Super. 2010) (citing **In re K.Z.S.**, 946 A.2d 753, 762-63 (Pa. Super. 2008)).

Our Supreme Court has recognized that "case law indicates that bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." **K.T.**, 296 A.3d at 1109. Further, trial courts "must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." **Id.** at 1106. We will not disturb a trial court's section 2511(b) assessment if the factual findings are supported by the record. **M.E.**, 283 A.3d at 839.

In his first issue, Father contends that DCCY prematurely filed for the involuntary termination of his parental rights. **See** Father's Brief at 16. Father posits that although the Children had been in the custody of DCCY since October 2022, Father did not acknowledge his paternity until December 15, 2023, the date of the aforesaid New Jersey order, and just three months before DCCY filed their petitions for termination. **See id.** The crux of Father's argument is that until his paternity was legally established, he was not required to perform parental duties for the Children. **See id.** In support, Father relies upon 23 Pa.C.S.A. § 5103(d), which provides:

> **(d) Conclusive evidence.--**Notwithstanding any other provision of law, an acknowledgment of paternity shall constitute conclusive evidence of paternity without further judicial ratification **in any action to establish support**. The court shall give full faith and credit to an acknowledgment of paternity signed in another state according to its procedures.

- 14 -

***Id.*** (emphasis added). Therefore, according to Father, the court erred in terminating his parental rights pursuant to section 2511(a)(1) because DCCY provided him with just three months to perform parental duties, instead of six months as stated in the statute. ***See id.*** We disagree.

Not only does Father fail to cite any relevant law supporting this proposition, but a review of this Court's case law indicates the contrary. In ***In re Z.S.W.***, 946 A.2d 726 (Pa. Super. 2008), this Court declined to "accept the trial court's rationale that [the father] was only required to 'attempt the level of parenting consistent with his and the agency's knowledge of his parentage.'" ***See id.*** at 731. Specifically, this Court rejected the trial court's determination that the father was "not required to perform any parental duties until he received the results of the paternity test" because "[t]o adopt [this] rationale would relieve all fathers of their parental duties until their parentage was confirmed by a paternity test." ***See id.***; ***see also In re Adoption of B.G.S.***, 245 A.3d 700, 707 n.2 (Pa. Super. 2021) (citing ***Z.S.W.,*** 946 A.2d at 731) ("If a father knows or has reason to know of a child's existence, he need not have conclusive proof of his paternity before the relevant six-month period begins."). Finally, to the extent that Father relies on 23 Pa.C.S.A. § 5103(d), we find his argument unavailing as this statute is in regard to establishing paternity for child support purposes, which is not at issue in the case *sub judice*.

In determining that DCCY met its evidentiary burden pursuant to section 2511(a)(1), the orphans' court stated the following:

> Contrary to Father's assertion, the record in this matter establishes by clear and convincing evidence that Father has shown a settled purpose of relinquishing parental claim to the Children and has refused or failed to perform parental duties for a period of at least six months prior to the filing of [DCCY's] petition seeking the involuntary termination of his parental rights. Father himself admitted that he has not seen or communicated with the Children since 2020 when Mother moved from New Jersey to Pennsylvania. Since Father was notified in November 2022 that the Children had been placed into [DCCY] custody, he has taken an entirely passive approach and has made no significant efforts to prepare himself to be a caregiver for the Children or to reintegrate the Children into his life.

Orphans' Court Opinion, 11/21/24, at 16-17. The orphans' court also emphasized that Father "never took the initiative of presenting himself for paternity testing," failed to contact DCCY to inform the Agency that his home remodel was complete, and never attended any hearings during the Children's dependencies. *See id.* at 17-18. These findings are supported by the certified record.

Father's lack of contact and involvement with the Children extended well-beyond the six-month statutory period. Father confirmed that he has not seen the Children since 2020. *See* N.T., 9/25/24, at 87-88. As related *supra*, Ms. Torres emphasized the importance of visitation when she spoke with Father, but he never indicated a desire to visit them. *See id.* at 19-30. She further testified that contact between Father and DCCY was almost always initiated by DCCY. *See id.* at 22. She informed the court that, other than a

singular text to a DCCY supervisor wishing the Children "happy birthday," Father did not provide any gifts nor attempt to communicate with the Children via telephone. *See id.* at 19-21.

In addition, Father informed Ms. Torres when they first spoke that he could not be a resource because he was remodeling his home. *See id.* at 23, 31. Instead of informing DCCY when he finished the remodeling, Father opted to wait until May 2024, when DCCY reached out to him, to make them aware that the remodeling was complete. *See id.* at 24.

Ms. Torres and Ms. Smith also testified that they provided Father notice of all court proceedings, petitions, and orders. *See id.* at 10-11, 102-103. Ms. Torres confirmed that Father's address remained the same throughout these proceedings. *See id.* at 10-11. Ms. Torres and Ms. Smith both testified that their mailings were never returned as undeliverable. *See id.* at 11, 103. However, Father did not attend any of the proceedings until the termination hearing on September 25, 2024.

The record is clear that Father knew or had reason to know that he was the biological father of the Children well before he acknowledged paternity in connection with the December 15, 2023 order in the New Jersey child support action. As related *supra*, DCPP sent Father a letter in September 2019 that included an order entered by a New Jersey family court in July 2019, which mandated that Father obtain a paternity test because Mother had informed DCPP that he may be the Children's biological father. *See* DCCY Exhibit 1,

9/25/24. Nevertheless, Father denied paternity at that time. **See** N.T., 9/25/24, at 18, 66-68. However, throughout the Children's dependencies, Ms. Torres repeatedly asked Father to obtain confirmation of his parentage of the Children. **See id.** at 13-18, 44, 48. This Court, like the orphans' court, will not reward Father for his lack of initiative in establishing his paternity to the Children. Accordingly, his argument fails.

Based on the foregoing, the record supports the court's determination that Father had failed to perform his parental duties for a period in excess of six months prior to the filing of the termination petitions as required by Section 2511(a)(1). The certified record evinces that Father wholly failed to perform his parental duties throughout the entirety of the Children's dependencies. Father's contention that he was not required to perform parental duties until his parentage was established is belied by law. Therefore, upon consideration of the totality of the circumstances, we discern no error of law or abuse of discretion. Therefore, Father's issue fails with respect to section 2511(a)(1).

Having established that the court did not err in terminating Father's parental rights to the Children pursuant to section 2511(a), we now turn to Father's argument regarding section 2511(b). Father essentially argues that the orphans' court erred in analyzing the section because DCCY did not provide clear and convincing evidence that termination was warranted pursuant to section 2511(a). **See** Father's Brief at 40-47. Father asserts that the court did not properly analyze foster mother's bond with the Children. **See id.** at

42-43.  Father cites to *In the Interest of R.R.D.*, 300 A.3d 1077 (Pa. Super.

2023) solely for the proposition that where an agency fails to prove section

2511(a) by clear and convincing evidence, the court need not address section

2511(b).  *See* Father's Brief at 46-47.

To the extent that Father argues that the orphans' court should not have

examined section 2511(b), we refer to our analysis above regarding section

2511(a)(1).  Further, the orphans' court provided the following rationale

regarding section 2511(b) in its Rule 1925(a) opinion:

> In the instant case, the best interests of the Children were clearly served by terminating Father's parental rights and ordering the that Children remain in the custody of [DCCY] and the Children's foster mother[.]
>
> The record provides no evidence to suggest that a healthy bond exists between Father and the Children.  Father has not seen or spoken with the Children since 2020 when they were not more than two years old, and the only reasonable inference to be drawn from the record evidence is that the Children have no memory of their Father whatsoever.  In fact, due to Father's continued absence from their life, they are unable to specifically identify who their father is and often mistake generic male adults for their father.  The Children have now been living in [foster mother's] capable care for over two years, and according to [her], the Children are doing "very very well" under her care.  The Children recently started full-day kindergarten and are enrolled in play and occupational therapy.  The Children have several medical concerns that [foster mother] is working to ensure are addressed.  M.B.T. was recently diagnosed with hearing loss in her right ear and is in the process of being evaluated for possible sleep apnea. . . .  As of the September 2024 hearing, B.M.T. was scheduled for a neuro-psych[ological] evaluation the following week.
>
> Given the Children's emotional and physical needs, with which [foster mother] is intimately familiar, and considering the complete lack of bond between Father and the Children as well as Father's lack of expressed desire to serve as a nurturing and stable

resource for the Children over the last several years, we are convinced that removal of the Children from the only stable and loving home they have known [] would be harmful to their emotional and physical well-being.

Orphans' Court Opinion, 11/21/24, at 22-23. The orphans' court's findings are supported by the record.

As related *supra*, Father admitted to not seeing or speaking to the Children since 2020. *See* N.T., 9/25/24, at 87-88. Due to Father's lack of contact and involvement for approximately four years, the court was well within its discretion to determine that no bond existed between Father and the Children. Indeed, foster mother testified that the Children sometimes think strangers are their father. *See id.* at 53. Although the Children have displayed a general curiosity about father figures and a father's role, there is no evidence in the certified record that the Children have any recollection of Father or that they have asked to see him. *See id.* at 52-53.

Conversely, the record demonstrates that the Children share a necessary and beneficial relationship with foster mother. Foster mother is a pre-adoptive resource who has cared for the Children since the inception of this case in October 2022. *See id.* at 51. Foster mother is attuned to the Children's needs, ensuring that the Children are receiving the services necessary for their emotional and physical well-being. *See id.* at 51-54. For example, foster mother testified that M.B.T. was recently diagnosed with hearing loss in her right ear and was going to be evaluated for possible sleep apnea. *See id.* at 55. Regarding B.M.T., she had a neuro-psychological

examination scheduled for the week after the termination proceeding to examine whether she is autistic or has any intellectual disabilities. *See id.* at 55-56. Foster mother further stated that the Children attend play therapy and occupational therapy. *See id.*

Based on the foregoing, the record evidence amply demonstrates that the termination of Father's parental rights will serve the developmental, physical, and emotional needs and welfare of the Children. Therefore, we discern no abuse of discretion by the court in terminating Father's parental rights pursuant to section 2511(b).

Accordingly, we affirm the decrees terminating Father's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b).

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 03/04/2025